**CASE NO. 23-2236**

---

## IN THE

## UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

---

LARISSA HARPER HAIRGROVE

Plaintiff - Appellant

v.

CITY OF SALISBURY; DOWNTOWN SALISBURY INC.; LANE BAILEY, in his individual and official capacity

Defendants - Appellees

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

---

**OPENING BRIEF OF PLAINTIFF-APPELLANT**

---

SUBMITTED BY:
Valerie L. Bateman
June K. Allison
NEW SOUTH LAW FIRM
209 Lloyd St., Ste 350
Carrboro, NC 27701
(919) 810-3139
*Counsel for Appellant*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.......................................................... iv

JURISDICTIONAL STATEMENT ................................................ 1

STATEMENT OF ISSUES ............................................................ 1

STATEMENT OF CASE ............................................................... 1

STATEMENT OF FACTS ............................................................. 3

SUMMARY OF ARGUMENT AND STANDARD OF REVIEW .... 29

ARGUMENT ........................................................................ 29

   I. THE COURT ERRED IN DISMISSING PLAINTIFF'S
      FLSA CLAIM AGAINST DEFENDANT DSI FOR
      FAILURE TO ALLEGE SUFFICIENT PLAUSIBLE
      FACTS TO SUPPORT AN INFERENCE OF
      INTERSTATE ACTIVITY .............................................29-30

        A. Plaintiff's FLSA claim met the standards of Rule
           8 and should not have been dismissed for failing
           to make allegations about interstate commerce,
           at least without giving Plaintiff a chance to
           amend her complaint. .............................................30

        B. Defendants failed to plead the affirmative
           defense that Plaintiff was exempt from the FLSA
           as an executive employee. .......................................34

        C. The evidentiary record on summary judgment
           showed that Defendants engaged in interstate
           commerce and that Plaintiff did not have
           sufficient employees to be considered exempt as
           an executive or administrative employee. ...............40

i

1.  The evidentiary record showed Defendants engaged in interstate commerce. ................................................... 40

2.  The evidentiary record showed that there was a genuine issue of material fact as to whether Plaintiff was exempt as an executive employee. .....................................41

3.  The evidentiary record showed that there were genuine issues of material fact as to whether Plaintiff was exempt as an administrative employee .............................43

4.  The evidentiary record showed the number of hours Plaintiff worked overtime.................................................... 45

5.  Defendants' failure to plead the executive exemption or provide discovery on it prejudiced Plaintiff.....................................45

II. THE COURT ERRED IN FINDING THAT PLAINTIFF FAILED TO PROVIDE EVIDENCE THAT SHE WAS TREATED DIFFERENTLY FROM MALE DEPARTMENT HEADS AND THAT SHE WAS SUBJECTED TO A HOSTILE WORK ENVIRONMENT BECAUSE OF HER SEX AND BECAUSE SHE COMPLAINED ABOUT BEING BULLIED BY DSI AND THAT SHE WAS RETALIATED AGAINST FOR ENGAGING IN PROTECTED ACTIVITY. .........................47

A. The record contained evidence that Plaintiff suffered an adverse action......................................49

B. The record contained evidence that Plaintiff's performance was acceptable at the time of her termination .........................................................51

C. The record contained evidence that Plaintiff was treated differently from male department heads and subjected to a hostile work environment..........................................................52

    1. Plaintiff produced evidence as to all of the essential elements of her claim that she was treated differently from Nick Aceves, the head of the Parks and Recreation department head............................................53

    2. The evidentiary record showed more than one isolated incident supporting Plaintiff's allegation that the City and DSI created and perpetuated a hostile work environment based on her sex........................58

    3. The evidentiary record shows evidence of retaliation for engaging in protected activity..........................................................64

CONCLUSION ................................................................66

STATEMENT REGARDING ORAL ARGUMENT................67

CERTIFICATE OF COMPLIANCE ...................................68

CERTIFICATE OF SERVICE ..........................................69

## TABLE OF AUTHORITIES

**Cases**

*Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960) .......... 46

*Ashcroft v. Iqbal,* 556 U.S. 662, 678, (2009) .............................. 30

*Baltimore Cnty. FOP Lodge 4 v. Baltimore Cnty.*,
   565 F. Supp. 2d 672, 675 (D. Md. 2008) ............................ 47

*Barrett v. Applied Radiant Energy Corp.*, 240 F.3d
   262, 268 (4th Cir.2001) ...................................................... 64

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570  (2007) .............. 30

*Benjamin v. Sparks,* 986 F.3d 332, 351 (4th Cir. 2021) ........... 29

*Bonds v. Leavitt,* 629 F.3d 369, 385 (4th Cir. 2011) ................. 29

*Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264,
   285 (4th Cir. 2015), .............................................................. 60

*Brinkley v. Harbour Recreation Club*, 180 F.3d 598,
   612 (4th Cir. 1999) ............................................................... 38

*Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742,
   763 (1998) ............................................................................ 62

*Chapman v. Oakland Living Ctr., Inc.*, 48 F.4th 222,
   234 (4th Cir. 2022) .............................................................. 50

*Chao v. Rivendell Woods, Inc.* 415 F.3d 342, 349
   (4th Cir. 2005) ...................................................................... 31

*Chastain v. Physicians Hair Transplant Ctr., Inc.,* No. 1:20-CV
   CV-1315TWT, 2022 WL 19388, at *5 (N.D.
   Ga. Jan. 3, 2022) ................................................................. 46

*Clark v. J.M. Benson Co.*, 789 F.2d 282, 286 (4th Cir.

1986) .................................................................. 45

*De'Lonta v. Angelone,* 330 F.3d 620, 633

(4th Cir. 2003).................................................... 39

*Desmond v. PNGI Charles Town Gaming, L.L.C.*, 564 F.3d

688, 692 (4th Cir. 2009)...................................... 46

*Donovan v. Brown Equip. & Serv. Tools, Inc.*, 666 F.2d

148, 153 (5th Cir. 1982)...................................... 46

*Green v. Brennan*, 578 U.S. 547, 555 (2016)............................ 50

*Guzman v. D & S Cap., LLC*, No. MAB 14-CV-01799,

2015 WL 772797, at *6 (D. Md. Feb. 20, 2015).................... 40

*Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).................... 60

*Holloway v. Maryland*, 32 F.4th 293, 301

(4th Cir. 2022).................................................... 59

*Hunter v. Sprint Corp.*, 453 F. Supp.2d 44, 50 (D.D.C. 2006) .... 47

*Johnson v. City of Columbia*, 949 F.2d 127, 129–30

(4th Cir.1991).................................................... 46

*Johnson v. City of Shelby, Miss.*, 574 U.S. 10,

10–12 (2014) .................................................... 30

*Manning v. Bos. Med. Ctr. Corp.*, 725 F.3d 34, 44

(1st Cir. 2013) .................................................... 33

*Morrison v. Cnty. of Fairfax, VA*, 826 .3d 758, 761

(4th Cir. 2016).................................................... 38

*Mosby-Grant v. City of Hagerstown*, 630 F.3d 326,

335 (4th Cir. 2010).............................................. 50

*Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 333–34

(4th Cir.2003)...................................................................... 63

*Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S.

75, 81 (1998)...................................................................... 60

*Renfro v. City of Emporia*, 741 F. Supp. 887, 888 (D.Kan.

1990), *aff'd,* 948 F.2d 1529, 1539 (10th Cir.1991)............... 46

*Reyazuddin v. Montgomery Cnty.*, 789 F.3d 407, 413

(4th Cir. 2015) .................................................................... 29

*Robinson v. Priority Auto. Huntersville, Inc.*, 70 F.4th 776,

780 (4th Cir. 2023)............................................................... 59

*Rodgers v. W.–S. Life Ins. Co.*, 12 F.3d 668,

675 (7th Cir.1993)............................................................... 62

*Rotondo v. City of Georgetown, S.C.*, 869 F. Supp. 369,

373 (D.S.C. 1994)................................................................ 46

*Sec'y of Lab. v. Labbe*, 319 F. App'x 761, 763

(11th Cir. 2008)................................................................... 32

*Shockley v. City of Newport New,* 997 F.2d 18, 21

(4th Cir. 1993)..................................................................... 45

*Manning v. Bos. Med. Ctr. Corp.* 725 F.3d 34, 44

(1st Cir. 2013) ..................................................................... 33

*Morrison v. Executive Aircraft Refinishing, Inc.*, 434 F. Supp.

2d 1314, 1318-19 (S.D. Fla. 2005) ....................................... 38

*Shockley v. City of Newport News*, 997 F.2d 18, 21

(4th Cir. 1993)..................................................................... 45

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002) ............ 31

*Tobey v. Jones*, 706 F.3d 379, 386 (4th Cir. 2013).................... 31

*Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651,

    659 (4th Cir. 2018) .......................................................... 59

*Woods v. City of Greensboro*, 855 F.3d 639, 648

    (4th Cir. 2017) ................................................................ 32

## Statutes

29 C.F.R. § 541.200(a) ........................................................ 43

29 C.R.R. § 541.100(a) ........................................................ 42

## Rules

F.R. Civ. P. 8 ...................................................................... 31

## Other Authorities

5 Charles Alan Wright & Arthur R. Miller,

    FEDERAL PRACTICE AND PROCEDURE § 1278

    (1990) ............................................................................. 31

## JURISDICTIONAL STATEMENT

This is an appeal from an interlocutory and a final order of the U.S. District Court for the Middle District of North Carolina. The District Court had federal question jurisdiction under 28 U.S.C. § 1331 to consider Plaintiff's federal Title VII, §1983, and Fair Labor Standards Act (FLSA) overtime claims. This Court has appellate jurisdiction under 28 U.S.C. §1291.

## STATEMENT OF ISSUES

Whether Plaintiff's FLSA claim against Downtown Salisbury, Inc. (DSI) was properly dismissed on a Rule 12 motion; and

Whether Plaintiff's a §1983 claim, Title VII claim, and FLSA and state law overtime claims against the City of Salisbury (City), its City Manager Lane Bailey (Bailey) in his individual capacity, and Defendant DSI were properly dismissed on summary judgment.

## STATEMENT OF CASE

Plaintiff filed a Complaint on October 18, 2021. JA0013-0029 Defendants City and Bailey answered on December 22, 2021. JA0030-0039 Plaintiff filed an Amended Complaint on February 11, 2022. JA0046-0071 Defendant DSI filed a Motion to Dismiss on February 15, 2022. JA0072-0074 Defendants City and Bailey filed

an Answer on March 23, 2022, JA0076-86, after being prompted by a letter from the Clerk, JA0075.

On March 29, 2022, the Court dismissed Plaintiff's FLSA claim against DSI. JA0088-90 The Court also found that Plaintiff had not assertd consitutional claims against DSI. JA0090.

On April 3, 2023, Defendants City, and Bailey filed motions for summary judgment, JA0120-022,JA0123-0573;JA0574-76. As did DSI, JA0574-76;JA 0580-1125.

Plaintiff filed a declaration[1], exhibits in opposition, JA1136-1575; and declarations from Liz Parham (state Main Street Director) with two exhibits, JA1576-1707, the City's former mayor, Alvena Heggins, JA1708-1714, and Plaintiff's former employee, Candice Brown, JA1715-1723.

On September 14, 2023, the Court granted Defendants' motion for summary judgment on all remaining claims, JA1931-1954, and entered judgment on September 19, 2023, JA1955. Plaintiff filed a and a Notice of Appeal. JA1976-1979. On November 27, 2023, the Court denied Plaintiff's motion for reconsideration and Motion to

---

[1] One uncorrected declaration, JA1136-1247, and one corrected declaration, JA1742-1898, were filed.

Amend on October 9, 2023, JA1956-1975;JA1980-91. The third corrected Joint Appendix (seven volumes) was filed with the Court on April 24, 2024.

## STATEMENT OF FACTS

In 2017, the City and DSI entered into an agreement, JA300-303, to establish a quasi-governmental public/private partnership, whereby City created a department overseeing downtown development and hired a department head who would also serve as DSI Executive Director (ED). This event followed months of emails and meetings between Liz Parham, the head of the NC Main Street program, the City, and DSI, and allowed DSI to forego the expense of the ED's salary. JA1576-1707

Plaintiff was hired as the ED in October 2017 by Defendant Bailey, the City Manager, JA1248-49, but upon arrival, learned that she would not report to him, but to his subordinate, Assistant City Manager Zack Kyle (Kyle). JA1747  Soon after beginning her employment, Plaintiff was actually assigned to Kelly Baker, Bailey's secretary, for some period of time. JA1760-61 By March 29, 2018, Plaintiff had been reassigned back to Kyle. JA1761,¶35 Mayor Heggins stated that Plaintiff should have been had a "full-fledged city

department and should have reported to Lane Bailey from the beginning in order to give the position the support and recognition that it would need to be successful." JA1712,¶19.

Prior to coming to Salisbury, Plaintiff had an extensive background in the NC Main Street program, having worked most recently in Wilson, NC, a highly successful NC Main Street town and knew Parham from Main Street trainings and conferences; Parham and her staff were a frequent resource to Plaintiff, JA1579-1590, JA1709,¶¶4-7.

Plaintiff also learned after she was hired that the City expected her to perform a job as a full-time department head and that DSI expected her to perform a job as a full-time ED. This required spending many hours in excess of forty outside the office[2], JA1760-1898,¶¶33,36-42;JA1564-75, and these expectations conflicted on numerous occasions to the displeasure of both entities, JA1576-1591,¶¶25-34. Attempting to meet the expectations required overtime even though she had no staff, JA1802-03,¶¶114-15, and little authority independent of the DSI Board and Kyle. JA1801,¶111;

---

[2] That Plaintiff was essentially working two jobs was recognized by the Mayor who commented on it in June 2019. JA1720 ¶¶5-8; JA1830 ¶179.

JA1804,¶117; JA2493-2509 A tug-of-war continued during her entire tenure in the positions. JA1434-40; JA1586,¶31

Plaintiff also noticed that other department heads were treated with more deference by both Bailey and Kyle, particularly Nick Aceves, the department head over the Parks and Recreation (Parks&Rec) department, JA1718¶16; with whom she was expected to work closely and on whom she was dependent in getting assistance with downtown development activities, JA1743-1898,¶¶7,33,52,77, 84,100,126,129,135,138,186,188,227,285.

Aceves had more than 21 employees when Plaintiff began her employment, and 15 at the end, JA1270, JA1308, JA1365, and Plaintiff was criticized for not providing him more support when Bailey terminated Plaintiff, JA0778-780, Plaintiff had no full time employees until October 2018, JA1743-1898,¶¶81,86,99,101,102.

Even after October 2018, Aceves still had at least six times the number of employees than she did. Plaintiff prepared a six-month summary of her meetings and other activities between October 5, 2017, through March 9, 2018. JA1429 Plaintiff's work plan for 2017-2018 was dated June 24, 2018, JA1087-93. Plaintiff should have received an initial six-month review in March 2018, but did not, nor

did she receive the 5% salary increase she had been promised in her offer letter. JA1248-49

Instead, when she asked about a six-month review and 5% pay increase, Kyle wrote a September 12, 2018, memo entitled "performance review" attached to an "Initial Six Months Review," JA1044 in which she was instructed to "respond to all emails and phone calls the same day within twenty-four hours." No other department heads, including Nick Aceves, were subjected to this performance standard. JA1711,¶12;JA1718-19,¶17; JA1590,¶43. *See also* JA1590,¶43  Bailey would later use this document to justify Plaintiff's termination, JA0778-80, ignoring the fact that Plaintiff had no employees during this time, JA1785-8,¶¶80-81.

When Plaintiff inquired again on September 18 about her annual review and raise, Kyle instructed her to justify why she should get a raise, which no other employees were asked to do. JA1786-87,¶¶83-84 After it became obvious Kyle was not going to perform a timely annual performance evaluation,  Plaintiff submitted a justification to Kyle on November 28, 2018.  JA1431  Even though Kyle finally approved the increase, he did not review her performance.

In the fall of 2018, Kyle and Plaintiff discussed the upcoming annual statewide Main Street conference to be hosted by Salisbury in March 2019, JA1432-33, and Kyle told her that he was removing her as the leader of the N.C. Main Street conference and replacing her with Latoya Price, one of Plaintiff's new full-time employees, stripping Plaintiff of the little authority she had.  JA1788-89¶¶86-87 By this time Plaintiff knew she was being retaliated against for opposing the discriminatory treatment.

The next month Kyle issued her a disciplinary action (DAR) in December 2018, JA0481-82, in response to complaints from the DSI staff:  "An email was sent to you on October 31 by one of the DSI board members and you did not respond until November 12 . . . .").  He reiterated the requirement to respond to all calls and emails within 24 hours. JA0481-82 Plaintiff again had not received an annual evaluation at this point and had only gotten full-time staff in October 2018, one of which he took from her almost immediately.

When Kyle finally provided Plaintiff an annual evaluation in January 2019, JA0482-95, it was yet another example of discriminatory treatment, in that it gave her a below average score (1.5) in the "management and supervisory" category, even though she

had only had two full time employees since October, one of whom Kyle took from her in November, and Kyle admitted that "[d]ue to Larissa's limited work with supervising staff I cannot fairly score her in this area." JA489. Yet he did, while receiving above average scores in core (2.0) and department (2.17) competencies, as a resutl of the 1.5, Plaintiff's total score was less than average (1.89), JA0494. Plaintiff knew from HR training that scores of 2 were the norm. JA1801-03

On February 22, 2019, Kyle and Bailey met with DSI Board members Wallace, Young, Tim Proper, and Shields to request that the City terminate Plaintiff. Kyle thanked them for the meeting, and informed he was "working towards preparing documentation concerning her performance," asking them for "assistance in providing [him] with specifics related to her performance that warranted" their request to terminate her. JA1074

In response, Shields sent a list with vague complaints about unanswered emails (no specific dates or examples), coming to meetings late and unprepared (no specific dates or examples), delegation to her assigned staff, and "a lot of activity, but very little progress." JA1074 The one specific instance he gave, the new

member board orientation (which occurred in June 2018 prior to the hiring of Plaintiff's full time employees in October), he described as "disorganized." Shields finally stated that the "lack of follow through on the Main Street conference and the City Council retreat" were the "two biggest issues which have gotten us to this point," again these preceded Plaintiff having two full-time staff members, but he "declined to comment" on those admitting a lack of information.

The City Council minutes for the May 2019 meeting show another example of discriminatory treatment of Plaintiff as compared to Aceves. Aceves received accolades from Lane Bailey for an event with which Plaintiff also assisted. JA1808-10,¶¶123-126.

On June 18, 2019, as promised to the DSI board members in February, Kyle issued Plaintiff a second DAR denominated a final written warning and included a three-day suspension. JA0510-11 Kyle issued this DAR even though he had a conversation with Plaintiff several days preceding it where Kyle and Plaintiff discussed the issues in the DAR. JA1497-98 One of those issues involved the fact that Plaintiff had been asked to work on the City's application to be a certified retirement community which had nothing to do with the Main Street District (MSD), the source of the tax revenue paying for

her department, JA1271, 1279, 1317, 1373. Plaintiff reminded Kyle that this assignment was outside the MSD and thus not something she was to be working on. As a basis for the DAR, he cited one unanswered email from Kelly Baker, JA0510-11; JA1817-25,¶¶¶¶146-165 and the "audit" of Plaintiff's email. Kyle was aware Plaintiff managed her email by designating "unread/unopened" emails she wanted to revisit. JA1821-22,¶¶156-57 In an email on June 14, copied to two other City employees, Kyle wrote: "If/ when I look at if you have been responding to emails, I hope you have complied with what is in your last disciplinary action." This email was an example of Kyle's demeaning treatment of Plaintiff. JA1497-98; JA1818,¶148)

In the DAR, he also referenced his previous instructions on June 14 to track one of Plaintiff's employees' time and have her prepare a report to turn into Kyle. JA0510. Plaintiff had sought clarification on the assignment on the 14th and believed that they had reached a different understanding about it. JA1818-19,¶¶149-50 Kyle also cited a review of her key scans into the building, JA0510, even though he knew she had early and late meetings outside of the building JA1822-23,¶¶158-160 Aceves was not treated like Kyle

10

treated Plaintiff. In addition, Kyle suspended Plaintiff for three days, knowing that she would have to work because of a scheduled DSI review and retreat.  JA1824-25,¶¶165-73

At the June 24th meeting with DSI state officials, attended by Mayor Alvena Higgins and she discussed in her declaration, JA1709-11, the Salisbury Main Street Program received accolades because it met 85 of the 99 maximum standards for a Main Street program while under Plaintiff's direction; the minimum number of standards required for accreditation was 59.  JA1709,¶4;JA1828-29,¶¶174-77 This accomplishment was unacknowledged, unlike with Aceves, as well as when Salisbury became a certified retirement community, even though Plaintiff's work on this was outside the scope of her tax-supported MSD work. JA1832-33, ¶¶168,184,187

Plaintiff responded to the DAR, JA0510, and subsequently Plaintiff met with Kyle and HR to discuss that she felt bullied. JA1823,¶¶168,180  Thus, the City was aware of Plaintiff's concerns about her hostile work environment and being bullied a year before her termination but did nothing.

On November 13, 2019, only ten months after Plaintiff's previous evaluation in January 2019, Kyle evaluated Plaintiff's

performance again.  JA0498-0509 This evaluation was better than the January evaluation, with a composite score of 1.92. JA0507

In her January evaluation, Kyle gave Plaintiff a 1 in "Relationship" and "Planning and Organization;" in her November evaluation, Kyle gave Plaintiff an improved rating of 2 in both "Relationship" and "Planning and Organization." She again received a 2.0 score in core competencies and a 2.17 in department competencies. JA0507

Interestingly, however, when compared to the January evaluation, the November evaluation in the "Management and Supervisory" section contained puzzling entries. In her January 2019 evaluation, Kyle gave her a 2 in Values.  In November, he changed the 2 she had received in January to a 1, but inexplicably stated that "Larissa has worked to improve in this area in the past months," JA21838,¶197, as if he had told her she needed to improve in January, which he had not. Ignoring this aberration or if Plaintiff had received a 2 instead of a 1, Plaintiff's overall rating would have been 1.99, instead of a 1.92. Nonetheless, in this area, Plaintiff's score increased from 1.5 to 1.6.

In the area in which he had not evaluated Plaintiff in January due to insufficient time as a supervisor, Kyle gave Plaintiff a 1 and stated that Plaintiff "has worked to improve in the area the past months" but provided no other explanation or comments for 1.0 rating in November.  JA0502

Overall, he included several positive comments including the following:

- adaptability:  "has tremendous energy and has accomplished a lot this past year" (score of 3.0) JA0499

- "Larissa has gotten property owners who never responded to work with DSI to do so and improve their properties." (score of 3.0) JA0500

- "A lot of new workshops have been offered and Larissa has developed a relationship with Catawba College business school." (score of 3.0) JA0500

- Planning and Organization:  "I have seen much improvement in this area." (score of 2.0) JA0859

- ". . . direct the overall economic development program of work for [DSI] . . .":  "great job in this area;" JA0504

- business retention: "Larissa has established relationships with the downtown stakeholders and held two successful stakeholders meetings." JA0505

- disciplinary: "Larissa was suspended in June for 3 days and was given a plan for Improvement and has done well with meeting the requirements of the plan." JA0506

- Overall comment: "Larissa's performance has vastly improved over the past four months. Larissa's knowledge and work she has done to improve the Main Street program has been outstanding. We have just had to work on her time management and staff development." JA0507

Five days after the evaluation, on November 19, 2019, Diane Young emailed NC Main Street staff Sherry Adams and Parham, copying Plaintiff and Williams, the then Board Chair, expressing the concern about the dual responsibilities of Plaintiff to the City and DSI and noting that the topic had come up again that morning at the monthly meetings between Plaintiff, Kyle, Williams, and Young. JA1583,¶25; JA1836-37,¶¶194-195; JA1434-40

Young expressed concern that the City assigned Plaintiff tasks completely unrelated to the downtown district or the MSD and that

14

the city staff were not working "solely for DSI" and "have a variety of City responsibilities." Young stated that "the DSI staff, in particular Larissa, are working hard to meet expectations of DSI, and our expectations are the same as if we had a staff that worked solely for DSI." She stated further that "Of course it is difficult for them to do this when they have a significant number of tasks on their plate that are not DSI related." JA1583,¶25;JA1836,¶194).

Parham replied stating that she hated "to hear that this is continuing to be an issue as there is so much important work taking place in Salisbury that I know requires a lot more energy and attention." JA1583,¶26 Parham attached two documents and explained her view of the issues between the City and DSI with regard to Plaintiff's job responsibilities in detail. JA1583 ¶26

Specifically, Parham noted the following:

- It is our expectation that the Main Street communities employ a Main Street director that is spending 40 hours a week on the redevelopment of the downtown district.

- Salisbury's downtown is very large. In comparison, Wilson, and Goldsboro's districts are equally as large, with 3 ½ staff people each, and budgets of more than $500K.

- You will note in the strengths and challenges document that it says that the city employee is a liaison to the nonprofit board. We see this as the equivalent to the City planner that serves as

a liaison to the planning board or the historic district commission, etc. Typically, staff is providing the administrative support to the nonprofit board through meeting notices, minutes, reminders, etc., and is supporting the board and committee members in completing the board's plan of work. To be clear – the plan of work that is developed is the board's plan of work, not the staff's plan of work. The staff is expected to assist the board with the implementation of their downtown workplan. That means that there are some tasks that staff is best suited to complete and some tasks that the board is best suited to complete. In addition, I think it is important for staff to provide the level of detailed support to make sure that the plan of work is well written, that the tax returns are filed on time, etc. in order to remain in compliance with the IRS, NC Main Street, National Main Street, City expectations, etc.

JA1584-85,¶27

Finally, Parham suggested that the City and DSI "create documents . . . to provide clarification and assistance to DSI and the City about reasonable expectations for the Executive Director position," JA1585, and Parham offered to facilitate a meeting between the City and DSI, JA1586,¶29.

On December 4, 2019, Plaintiff and Parham exchanged emails about a draft response to a citizen email. JA1586,¶31 Plaintiff thanked Parham for her help in drafting a response and then stated ask to have a call indicating that "[t]here is still a tug of war going on," that matters had gotten worse, and that Kyle had told Plaintiff that Whitney Williams had composed a letter to the City attorney

wanting staff to do less "City work" so that DSI would have total control of DSI staff. JA1586,¶31.

Ensuing emails attempted to schedule a time for Parham to come to Salisbury, JA1586-87, and Parham eventually came to Salisbury to facilitate a meeting on January 30. JA1839-40,¶200; JA1587,¶¶33-34 After the meeting, emails were exchanged between Parham and Williams, each setting forth a view of the conclusions reached at the meeting. In response to Williams' email, Parham sent an email reframing the information transmitted by Williams to Kyle and Plaintiff. JA1587,¶33; JA1434-40 A comparison of the two summaries reveals the continued tension and disagreement over the extent to which the DSI board and the City would dictate Plaintiff's activities. JA1434-40

The proper role of the ED took on a different direction with the January 28, 2020, and February 25, 2020 DSI board meetings, when the issue of whether and when the Board could conduct closed session meetings to discuss operational concerns, despite the Open Meetings law, became a concern. At the meetings, Williams as chair called closed sessions and excluded all City staff. DSI's version of

events can be found in a March 17, 2020, letter from the DSI Organizing Committee. JA0754-077

The DSI letter was precipitated when, after the February meeting, Williams noticed the City's recording device had been left on the table in the closed session. Wilson and Young decided to "record" the open session on Young's phone and then send that file via email to Plaintiff, to prevent Plaintiff from having access to the closed session recording, which they did, and then delete the recording from the City's device.

As it turned out, the recording of the closed session portion of the meeting had not been successfully deleted from the device. When Plaintiff realized this, she consulted Kyle who instructed her to listen to it. Kyle then informed Williams that Plaintiff had listened to it. Williams advised Kyle that she would have no choice but to tell the Board what happened, because the Board's "trust" had been "breached." JA0754-077;JA1441-1450

The DSI letter admitted that Chair Williams had called for "Closed session" discussions at which she excluded "all City personnel and our City Council Liaison and argued they were for the "purpose of promoting a candid discussion on how the nonprofit

18

Board felt the partnership was going since it was established 2.5 years ago," and made allegations that Plaintiff had taken "grave," "inappropriate actions," and engaged in "a deliberate breach of the board's trust", "potential criminal acts and violations of City of Salisbury Employee policy." The letter accused Plaintiff of secretly and inappropriately recording the February board meeting. (Kyle and Plaintiff had previously discussed the closed sessions which he stated were problematic and agreed they were possible violations of law.)

The DSI letter closed, stating:

> While we recognize that the DSI Board has no voice in City personnel disciplinary matters, it is the opinion of the majority of Organization Committee that Harper should have been suspended, or at the very least removed from DSI matters and communication with the DSI Board, pending an internal investigation promptly upon the City's learning of her terminable and potentially criminal violation. As she was not, our Board - which continues to work actively to help downtown business owners in the retail, restaurant, and service sector who are facing the most critical test to their business's viability ever - has been placed in a difficult situation of continuing to work with an Executive Director who we hold in contempt. As it stands now, Organization Committee does not see a workable scenario where the existing Board remains intact with the current Executive Director.

JA0754-77

19

Plaintiff's April 12, 2020, response, JA1441-50, to the accusations was to note that the closed session board meetings which excluded staff and certain board members were in violation of the state Open Meetings Law and symbolic of the tug of war over her role. Plaintiff addressed the hostility and micro-management to which she had been subjected. See, also, e.g., JA1846 ¶¶215-16 Plaintiff provided a detailed timeline of events which occurred, including but not limited to  the fact that she conferred with Kyle before responding to the emails from Young on the 26th and 27th, notified him on the 27th, as soon as she realized that the recording had not, in fact, been deleted from the device returned to her, and then listened to the recording at his behest, noting that Kyle told Plaintiff that he had told Williams that he instructed her to listen to the recording, and that Kyle told her he had a meeting with Williams on or about March 3 at which he expressed his concern over the legality of the closed sessions of the DSI board, which was confirmed by DSI's letter stating that Kyle and Williams met on Tuesday, March 3, at which time Kyle disclosed to Williams that Plaintiff had listened to the recording. JA1441-50

Plaintiff also noted that from the time she was hired, she had been "targeted and criticized for every piece of minutiae regarding tasks to complete, sometimes in a very unrealistic timeframe, by Chair Williams and Vice-Chair Diane Young" and subjected to a "constant battering of emails, condescending remarks, and finger-pointing at me for any real or unreal action of 'nonperformance' of the board and committees' tasks." JA1441-50

Plaintiff also offered to work in any organizational structure determined to be workable by the City and DSI and stated she would not hold a grudge about the accusations made against her. JA1441-50 Plaintiff noted information she had received from board members who had spoken about the "ludicrous plot" against Plaintiff and that other members were "fearful of retaliation" and had spoken to Plaintiff and other board members in confidence. JA1441-50 Plaintiff also relayed that a board member had criticized Williams' proposed MOU with the City as micromanagement of the ED, and that it would be disaster for DSI which would have to give up all of the benefits of the partnership in order to operate in a way that had not been successful with the past interim and previous Directors. In addition,

the board member noted that the MSD funding for programs would have to go to personnel and office expenses again.

Plaintiff also relayed that a couple of other board members dissented along with the board member who was not scared to speak out and would like to be voted Chair next year to help keep this successful structure in place that is only going through "growing pains" in his opinion. JA1441-50

Plaintiff's letter also relayed that on March 26, at 2:30p, after the letter from DSI to the City accusing Plaintiff of "possibly" criminal conduct, she had spoken to board members who felt as though Plaintiff had been "set up" due to Williams and Young being "joyful and cheering at a meeting at Vice-Chairwoman Young's house." JA1441-50

Plaintiff further relayed that she had learned from Moscardini on March 30 that the March 17th letter "was sent from Whitney with only 30 minutes for the Officers and Committee chairs to review and decide whether to sign before it was to be submitted. This shows undue pressure on the rest of the group to be either with the few or against in this action." JA1441-50 Plaintiff indicated that one of the board members had openly voiced her frustrations to staff about the

micromanagement styles of both Young and Williams and had questioned their abrupt and knee-jerk actions." JA1441-50

Plaintiff recounted that board members had discussed the possible invalidity of the closed session meetings, that the ex-officio members of the Board had full voice and vote and included city employees and staff, that Plaintiff was required to use the recording device to prepare the minutes and thus the recording did not violate any criminal law or City policy, and that she had to record the meeting because neither of her other employees were at the meeting. JA1441-50

Despite Plaintiff's fulsome response, on May 6, City Manager Bailey, who had taken over supervision of Plaintiff from Kyle after the March 17 letter, did not provide her response to any of the DSI board members. He did however send performance evaluations to a select group of only 13 of the 21 DSI board members, again treating Plaintiff differently from Aceves. JA1512-62; JA1843,¶210

The performance evaluation was contrary to both the terms of the MOU2 and also the guidance given by Parham at the January 30, meeting between the City and DSI and her February 3, 2020 follow-up email where she described the evaluative process thusly: "MOU

states[3] that the DSI board will have input in the director's performance. The Board will not review staff, but provide input. That has not been happening, therefor Zack will send out a 3 question survey annually to solicit input from the board." JA1854; JA1434-40

Even so, the board responses demonstrably refute Bailey's description of them: for example, Bailey states that "[o]verall, the evaluations demonstrate an inability to perform your job duties up to my expectations or the DSI Board's expectations." Bailey further described the evaluations, stating that in 3 of 6 categories, Plaintiff's performance rated as "below expectations" and that "[o]verall, you received 39 ratings of "below expectations," 35 ratings of "meets expectations" and 4 ratings of "exceeds expectations." JA1512-62

In fact, a review of the actual documents shows that the split of ratings resulted in a virtual tie; Plaintiff had just as many meets or above expectations as she had below expectations. Also noticeably missing from Bailey's summary of the "evaluations," was the following information: three separate board members made

---

[3] The MOU stated that "[i]nput will be solicited from the Downtown Salisbury, Inc. Board annually on the performance of the Downtown Director, but all performance reviews and all compensation decisions will be conducted or made by the City Manager or his designee." (JA 157-159; JA379-382)

24

references to what one of them described as "the elephant in the room" and these members were responsible for a total of 15 of the "below expectations" ratings given to Plaintiff. JA1512-62

The "elephant" was a reference to the March 17th letter. These evaluations are dated between May 8 and May 25 are provide insight into the effects of the discussions about the contents of the March 17th letter. No investigation was conducted by the City, and despite Plaintiff's pleas to have the City Attorney weigh in on the allegations, no defense of Plaintiff and the accusations against her was ever provided by the City or Bailey to the DSI Board members. JA1512-62

After Plaintiff's April response and the May DSI evaluations, Plaintiff continued to do her job during this time and detailed her accomplishments in her affidavit.  JA1843-44,¶212; JA1847,¶219 On May 11, 2020, Plaintiff detailed additional requests for support with regard to the hostile work environment.  JA1846 ¶¶215-216)

On June 17, 2020, at 12:52pm, Plaintiff sent an email to City Manager Bailey, City Attorney Graham Corriher, Board Chair Williams, and Board Members Moscardini and Shields, with cc's to Assistant City Manager Kyle, Board Member Wilson and City Clerk Kelly Baker and noted the urgency of finalizing the MOU between DSI

and the City and posed several questions to the City Attorney regarding combining some documents. (JA2590)

In response, Williams replied all and added City Council member Bryan Miller, who also sat on the DSI Board and was the City Council liaison and attached a proposed MOU she had previously sent to Kyle and Corriher, on February 11, 2020. JA1848-49 ¶221 Williams described the document as "proposed changes from the DSI board that merged after the facilitated session with Liz Parham." Williams also stated (foreshadowing Plaintiff's termination) that she was also "waiting on the City's response on an important matter before the DSI board decides how to proceed further on the MOU. Further, the finalized document must go before the full board for discussion and a vote before any Officer could sign that renewal document." JA1848-51

Notably, "revising the MOU" was listed only in Williams' take aways from the January 30 meeting; Parham's summary of action items conspicuously omitted any reference to revising the MOU and even the sample MOU sent to Lane Bailey on May 4, which was the same sample attached to Plaintiff's June 17 email, did not contain any of Williams' proposed changes. JA1848-51

After receiving Williams' proposed MOU and reviewing it, Plaintiff reviewed it, sent an email to Parham concerning Williams' draft MOU. Plaintiff noted that she had suggested the NC Main Street sample MOU for their organizational structure and also included a discussion of the "duties" section from Williams' proposed MOU which were problematic. JA1848-51

Parham replied "all" and included her comments along with the ones made by Plaintiff in her previous email. Parham included specific excerpts from her February 3, 2020 follow up email after the meeting which Williams referenced as being the source of her revised MOU. Parham noted that her previous advice was not consistent with Williams' drafted "Duties of the City" section pertaining to the supervision of the ED as between the City and DSI. Parham also noted that Williams' drafted "Duties of the DSI Board" sections also needed to be revised to make it clear that Plaintiff was a "city staff member" and that the MOU should refer to her as that, not as ED of the nonprofit and that the nonprofits workplan should be directed by the city, with nonprofits executive committee proving "input only" on the approved plan of work. JA1848-52

Finally, as to the provision under the MOU providing that the City would agree to allow DSI to hold closed sessions excluding "City staff and affiliates" as needed, Parham stated unequivocally:

> This is not appropriate. As you all know, closed sessions are held for the purpose of discussing personnel and real estate transactions only, in accordance to open meetings laws. Open meetings are applicable to a nonprofit organization when the majority of the funding comes from the city AND the majority of the board is appointed by the city council. Ex-officio members and staff were never excluded from the meetings when I worked at the local level, unless it was for my review. If the desire to hold closed meetings is intended to exclude key individuals then there is still a much bigger issue at hand – one of trust and collaboration.

JA1848-52

Rather than attempting to resolve the matter about the propriety of closed session meetings, on Friday, June 19, Bailey called Plaintiff to a meeting where he discussed her performance during her tenure and the evaluations he obtained from by the DSI board. On Monday, June 22, Bailey delivered a pretermination letter to Plaintiff, JA1856-57; JA778-80, and scheduled her pre-dismissal conference for Wednesday, June 24, the day before the scheduled Board meeting and retreat at which Parham was scheduled to present.

The record contains facts showing genuine issues of material fact such that a reasonable jury could have found that Plaintiff was entitled to overtime and that she was treated differently because of her sex.  In addition, the evidence presented would also show that Plaintiff was terminated not only in violation of her rights to equal protection but also because she opposed the closed session meetings proposed by Whitney Williams which was a violation of her first amendment rights.

## SUMMARY OF ARGUMENT AND STANDARD OF REVIEW

The Court erred in dismissing Plaintiff's FLSA claims against Defendant DSI. In addition, the Court erred in granting summary judgment under Rule 56(c) against Plaintiff on all remaining issues (FLSA, Title VII, and §1983) when Plaintiff produced evidence which created several genuine issues of material fact.  The Court's review of both of these issues is de novo. *Benjamin v. Spark*s, 986 F.3d 332, 351 (4th Cir. 2021) (citing *Bonds v. Leavitt,* 629 F.3d 369, 385 (4th Cir. 2011) (motion to dismiss) and *Reyazuddin v. Montgomery Cnty.*, 789 F.3d 407, 413 (4th Cir. 2015) (summary judgment).

## ARGUMENT

## I. THE COURT ERRED IN DISMISSING PLAINTIFF'S FLSA

29

**CLAIM AGAINST DEFENDANT DSI FOR FAILURE TO ALLEGE SUFFICIENT PLAUSIBLE FACTS TO SUPPORT AN INFERENCE OF INTERSTATE ACTIVITY.**

### A. <u>Plaintiff's FLSA claim met the standards of Rule 8 and should not have been dismissed for failing to make allegations about interstate commerce, at least without giving Plaintiff a chance to amend her complaint.</u>

Plaintiff's FLSA claim was dismissed on a Rule 12 motion against DSI for lack of allegations about interstate commerce, with the Court holding that Plaintiff "alleges no facts raising a plausible inference that DSI meets the interstate commerce element of that claim" and that "the complaint is silent as to any interstate activity by DSI or the City; silent as to any interstate work the plaintiff undertook, with out-of state developers, for example; and silent as to the extent of any interstate activity." JA0089 The Court's order ignored Fourth Circuit precedent and cited a case from the First Circuit inconsistent with that precedent.

Pre-*Twombly*, this Court[4] reversed a district court's application of excessive pleading standards to FLSA complaints finding that the

---

[4] In *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009), and *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 11, (2014), the Court reiterated that "a basic objective of the rules is to avoid civil cases turning on technicalities," *Johnson, id.* at 11, and "[a]llegations have facial plausibility "when the plaintiff pleads ***factual content*** that allows the court to draw the reasonable inference that the defendant is liable for the

dismissal "not only ignored *Virginia Baptist Hospital*, but it also employed a rationale demonstrably at odds with the Federal Rules." *Chao v. Rivendell Woods, Inc.*, 415 F.3d 342, 349 (4th Cir. 2005). In *Chao*, this Court reversed the district court's order requiring amendment of an FLSA complaint holding "the complaint stated the jurisdictional grounds for the claim, identified the sections of the Act that the hospital had allegedly violated, described the nature of the violations, specified the period of time in which they occurred, and notified the hospital of the relief the Secretary sought." *Id.*

The *Chao* Court found the complaint clearly met the "simplified notice pleading standard" of Rule 8(a) which it described as "the core of the pleading process under the federal rules," explaining that "the sufficiency of a complaint does not depend on whether it provides enough information to enable the defendant 'to prepare a defense,' but merely 'whether the document's allegations are detailed and informative enough to enable the defendant to respond.'" *Chao,* 415 F.3d at 349 (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002) and quoting 5 Charles Alan Wright & Arthur R. Miller, FEDERAL

---

misconduct alleged," *Iqbal, id.* at 662. *Accord Tobey v. Jones*, 706 F.3d 379, 386 (4th Cir. 2013).

PRACTICE AND PROCEDURE: CIVIL 3D § 1215, § 1215, at 173-74, 193 (3d ed. 2004)).

The Eleventh Circuit, citing *Chao,* has noted that

> [u]nlike the complex antitrust scheme at issue in *Twombly,* the requirements to state a claim of a FLSA violation are quite straightforward. The elements that must be shown are simply a failure to pay overtime compensation and/or minimum wages to covered employees and/or failure to keep payroll records in accordance with the Act. See 29 U.S.C. §§ 206, 207, and 215(a)(2) and (5).

*Sec'y of Lab. v. Labbe*, 319 F. App'x 761, 763 (11th Cir. 2008).

Post-*Iqbal* and *Twombly*, this Court has reinforced such pleading standards. A plaintiff "need not plead facts sufficient to establish a prima facie case" of her claim or to support each "essential element" of her claim "to survive a motion to dismiss. *Woods v. City of Greensboro,* 855 F.3d 639, 648 (4th Cir. 2017). So has the United States Supreme Court: "[f]ederal pleading rules call for 'a short and plain statement of the claim showing that the pleader is entitled to relief,' Fed. Rule Civ. Proc. 8(a)(2); they do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 10– 12 (2014).

Plaintiff alleged that she was jointly employed by the City and DSI, JA0013-29,¶¶14-18, and that while she was "theoretically employed as an exempt department head," she was not treated as one and was required to work many hours in excess of forty hours a week in violation of the FLSA which she documented, JA0013-29 ¶¶18,19,31; JA1564-75. Where, as here, the Plaintiff "stated simply, concisely, and directly events" that entitled her to damages from the city for failing to pay her overtime, and thus "informed the city of the factual basis" for her FLSA claim, she was "required to do no more to stave off threshold dismissal for want of an adequate statement" of her claim." *Id.* at 12. The District Court's order relies on *dicta* in a First Circuit case, *Manning v. Bos. Med. Ctr. Corp.*, 725 F.3d 34, 44 (1st Cir. 2013), for the proposition that a "basic element" of an FLSA claim is that the work involved interstate activity. However, the *Manning* Court noted that the issues in that case regarding the "sufficiency of the [FLSA] allegations"

> . . . boil[] down to three issues: (1) whether the complaint sufficiently pleads BMC's actual or constructive knowledge of plaintiffs' undercompensation; (2) whether the facts alleged make out a claim that plaintiffs performed compensable work for longer than forty hours per week; and (3) whether each named plaintiff has sufficiently alleged that she worked compensable

overtime.

*Id.* The Court actually noted that "Rule 8 does not demand" the "degree of particularity" argued by the Defendants and noted that "[e]ven where direct allegations of knowledge are pled in a conclusory fashion, defendants' knowledge of unlawful conduct "may be inferable from other allegations in the complaint." *Id.* (citation omitted).

**B. <u>Defendants failed to plead the affirmative defense that Plaintiff was exempt from the FLSA as an executive employee.</u>**

Rule 8 requires affirmative defenses to be pled specifically. Neither City Defendants, Bailey in his individual capacity, or DSI affirmatively alleged as a defense in their answers that Plaintiff was an "exempt executive" employee. Yet, the Court based its order granting summary judgment to Defendants on its finding that "no reasonable jury could find, based on the evidence of record," Plaintiff was not an "exempt executive employee." JA1949-53.

In the Defendants City's and Bailey's Answers, JA0030-39,¶19; JA0076-86,¶19, they stated in response to Plaintiff's allegation the following: "It is admitted that Plaintiff was an exempt employee. Except as admitted, denied as stated." Plaintiff's complaint did not

state that she was an "exempt employee." In addition, Defendants Bailey and the City failed to allege any particular category of exemption (administrative or executive).

Plaintiff's complaint did not allege that Plaintiff was an exempt employee, such that Defendants' "admission" was an appropriate response. Instead, Plaintiff stated that she "was theoretically employed as an exempt department head," but "in reality her hours and duties were under significant daily scrutiny by Bailey, and Kyle, and during some portion of her employment, she was also told she was being supervised by Bailey's administrative support person." JA0013-29,¶19

Likewise, when Defendant DSI answered this allegation, it stated as follows:

> ¶19. In response to the allegations of Paragraph 19, it is admitted that Plaintiff was a salaried, exempt employee. Except as specifically admitted herein, the allegations of Paragraph 19 are denied.

JA0091-0108,¶19) Neither the word "exempt" nor the word "executive" appear elsewhere in either Defendants' Answer. Nor does the word "administrative" appear anywhere in either Defendants' answer.

35

The only place that Defendant DSI specified a type of exemption was in its motion to dismiss where it stated the following:

> Plaintiff's claim for overtime wages in Count Three pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. 201 et. seq. and the North Carolina Wage and Hour Act, N.C. Gen. Stat. §95-25.1 et. seq. because DSI was not an employer obligated to pay her wages; she has failed to properly allege that DSI is covered by the FLSA, and Plaintiff was a salaried, overtime exempt employee, that her duties were consistent with those of a department head under the FLSA's **administrative** exemption.

JA577-0579 (emphasis added). In its memorandum, it likewise briefed the **administrative** but not **executive** exemption extensively. However, the Court did not raise the exemption issue in ruling on DSI's motion to dismiss Plaintiff's FLSA claim but dismissed the FLSA claim because Plaintiff failed to adequately plead that Defendant DSI engaged in "interstate commerce." JA0088-90

During discovery, Plaintiff propounded the following interrogatory:

> Identify the process used and any policies followed to determine if City employees are exempt under the Fair Labor Standards Act from receiving overtime compensation between October 1, 2017, and list the employees determined to be FLSA exempt, the name of the person making the determination, name of the employee, dates of employment, job title, the basis for the exemption, and if an executive exemption is claimed, identify the

employees supervised by name and position.

JA1452-1453

Defendant City and Bailey responded as follows:

ANSWER: **<u>Objection.</u>** This interrogatory is overly broad, unduly burdensome and not calculated to lead to the discovery of admissible evidence. Notwithstanding and without waiving the previous objection, the exemption status is listed in the Position Listing and Salary Ranges spreadsheets provided herein. The City has used the following companies since 2017 to provide a job description, pay range and exemption status: Baker Tilley and The MAPS Group.

JA1453. No type of exemption (administrative or executive) was provided, JA0581-83, and Defendants refused to explain the basis for any exemption, administrative or executive, for any of its employees, and refused to provide the employees supervised by its employees designated as exempt executives.

And again, no Defendant pled that Plaintiff was exempt under either the *administrative* or *executive* exemption with any particularity in its answer, even though Defendant DSI alleged an *administrative* exemption as a basis for dismissing Plaintiff's FLSA claim.

This Court has noted:

Although it is indisputably the general rule that a party's

37

failure to raise an affirmative defense in the appropriate pleading results in waiver, *see* 5 Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE § 1278 (1990), there is ample authority in this Circuit for the proposition that absent unfair surprise or prejudice to the plaintiff, a defendant's affirmative defense is not waived when it is first raised in a pre-trial dispositive motion.

*Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 612 (4th Cir. 1999).

Under Federal Rule of Civil Procedure 8(c), the affirmative defense of an executive exemption must be specifically pleaded or else it will be deemed waived. *See Morrison v. Executive Aircraft Refinishing, Inc.*, 434 F. Supp. 2d 1314, 1318-19 (S.D. Fla. 2005) ("A claim of exemption under the FLSA is an affirmative defense that, pursuant to [Rule] 8(c), must be specifically pleaded or it will be deemed waived.") Defendants did not plead that they were entitled to an executive employee defense and they refused to produce discovery when questioned about this issue. JA1452-1453 Therefore, they are barred from relying on it in their motion for summary judgment.

The Court noted but refused to infer that the nature of work performed by Plaintiff for Defendants involved "any interstate work the plaintiff undertook, with out-of-state developers." Plaintiff had

not pled that she had worked with out of state developers, even though she had, but this was apparently at the very least suspected by the Court as one of the activities in which a downtown development employee would be engaged.

The Court's failure to draw this inference in favor of Plaintiff violated the rule that on a motion to dismiss, "[a] district court should not dismiss a complaint for failure to state a claim 'unless after accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief." *Chao*, 415 F.3d at 346 (quoting *De'Lonta v. Angelone*, 330 F.3d 620, 633 (4th Cir. 2003).

Even if Plaintiff's complaint was required to state facts showing that the City and DSI engaged in interstate commerce, the Court should have accorded Plaintiff the opportunity to amend to add such facts. In *Johnson,* after "summarily" (and *per curiam)* reversing the order dismissing the plaintiff's complaint, the Court held that upon remand the plaintiff should be "accorded an opportunity" to amend their complaint "[f]or clarification and to ward off further insistence

on a punctiliously stated 'theory of the pleadings.'" *Id.* Likewise, in *Guzman v. D & S Cap., LLC*, No. MAB 14-CV-01799, 2015 WL 772797, at *6 (D. Md. Feb. 20, 2015), even when finding an inadequate allegation that defendants engaged in interstate commerce, the Court granted the motion to dismiss, **and** leave to amend the complaint to add the same.

C. **The evidentiary record on summary judgment showed that Defendants engaged in interstate commerce and that Plaintiff did not have sufficient employees to be considered exempt as an executive or administrative employee.**

As for the Court's dismissal of Plaintiff's FLSA claim on summary judgment, the Court held that "no reasonable jury could find, based on the evidence of record, that Ms. Hairgrove was not an exempt executive employee." JA1949 However, none of the Defendants ever alleged Plaintiff was exempt as an *executive* under the FLSA, either in their answers or in any motion to dismiss.

Nonetheless, the evidentiary record was replete with evidence showing genuine issues of material facts related to Plaintiff's FLSA claim.

1. **The evidentiary record showed Defendants engaged in interstate commerce.**

40

At summary judgment, Plaintiff presented copious documentation of the involvement of both the City and DSI in interstate commerce, JA1744-45, in the form of City budget documents, specifically JA1263-66, JA1301-05, JA1358-62, website excerpts, JA1583, JA1576-1707. In addition, Defendants waived the affirmative defenses under the FLSA of arguing that Plaintiff was an exempt employee. JA0030-39; JA0076-86; JA0091-0108. Although DSI raised an allegation that Plaintiff was exempt as an *administrative* employee in its motion to dismiss, JA00577-79, the Court did not dismiss the FLSA claim against DSI on this ground but because it found an absence of allegations that DSI and the City were involved in interstate commerce. JA0088-90

> ### 2. The evidentiary record showed that there was a genuine issue of material fact as to whether Plaintiff was exempt as an executive employee.

On summary judgment, the Court dismissed the FLSA claim against the City and Bailey finding that "no reasonable jury could find, based on the evidence of record, that Ms. Hairgrove was not an exempt executive employee," JA1949, which defense had **never** been raised by any of the Defendants. The Court did not revisit its previous

41

conclusions that there was insufficient evidence of involvement in interstate commerce.

As the Court noted, the burden was on Defendants to show that Plaintiff was an exempt executive employee. JA1950 The elements from 29 C.F.R. 541.100(a) about which there were genuine issues of material fact were:

> (2)[Whether Plaintiff's] primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;
>
> (3)[Whether Plaintiff] customarily and regularly directs the work of two or more other employees; and
>
> (4)[Whether Plaintiff had] the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 C.R.R. 541.100(a)(2)-(4).

The evidentiary record negated the executive exception in that Plaintiff did not supervise two employees until after October 2018, JA1716 ¶8-9; JA1762-63 ¶37, when Candice Brown and Latoya Price came on board, a full year into Plaintiff's employment.

Plaintiff's first evaluation in January 2019 notably declined to review her supervisory abilities: "Due to Larissa's limited work

supervising staff I cannot fairly score her in this area." JA0489  In addition, Plaintiff had limited authority over the staff who she could hire/fire. JA1768-69,¶¶49-51

One month after Plaintiff attained two full-time employees, Kyle stripped Plaintiff of her supervisory authority over one of these employees, Latoya Price, and assigned Price one of Plaintiff's major duties, that of coordinating the March 2019 state Main Street conference.

> ### 3. The evidentiary record showed that there were genuine issues of material fact as to whether Plaintiff was exempt as an administrative employee.

The elements about which a genuine issue of material fact existed as to whether Plaintiff was exempt as an administrative employee are:

> 1.[Whether Plaintiff's] primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and
>
> 2.[Whether Plaintiff's] primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. § 541.200(a)(2)-(3).

The record contains many examples that Plaintiff did not act with discretion or independent judgment but was micromanaged and treated as an hourly employee. Kyle issued a memo in September 2018, prior to Plaintiff having two employees, demanding that Plaintiff return phone calls and emails within 24 hours. JA1044 He referred to it in a December disciplinary action report (DAR) in which he stripped Plaintiff of her supervisory authority over her subordinate employee Price and noted that he had found an email sent October 31 from a DSI board member to which Plaintiff did not respond until November 12. JA1042-43

In June 2019, a second DAR noted another audit of Plaintiff's emails, that she had not made suggested changes to a power point and that her time scans did not reflect that she was in the building between 8:30am and 5:30pm. JA1072-03 Three individuals all provided declarations that the nature of Plaintiff's job meant that she had meetings outside of these times at locations other than the City offices. JA1576-1595(Liz Parham); JA1708-1714 (Mayor Alvena Heggins); JA1715-1723 (Candace Brown)

Plaintiff's affidavit also recounted multiple incidents of micromanagement inconsistent with being an executive employee

and referred to texts showing this micromanagement. JA1742-1898
¶¶17-20, 27,31, 34, 46, 49, 50, 52, 56-59, 61, 63, 65-66, 68, 80-
82, 83-104, 106-11, 115, 117, 120, 125-129, 146-151, 154-70, 172,
177-78, 180, 186-89, 194, 202-05, 206, 208-09, 215-16.

### 4. The evidentiary record showed the number of hours Plaintiff worked overtime.

Plaintiff's affidavit referred to evidence of her overtime presented
as an Exhibit. JA1564-75 Although Plaintiff testified that she was
told she was exempt from the FLSA she was presented with
timesheets that were not signed by her and did not reflect the hours
she worked. JA0975-1041; JA1761-62

### 5. Defendants' failure to plead the executive exemption or provide discovery on it prejudiced Plaintiff.

Here, the Court's allowing Defendants to rely on the assertion
of an executive exemption at summary judgment is grossly
prejudicial to Plaintiff. Moreover, "employers must prove by clear and
convincing evidence that an employee qualifies for exemption."
*Shockley v. City of Newport News*, 997 F.2d 18, 21 (4th Cir. 1993)
(citing *Clark v. J.M. Benson Co.*, 789 F.2d 282, 286 (4th Cir.1986).
"Exemptions from or exceptions to the Act's requirements are to be

narrowly construed against the employer asserting them." *Johnsonv. City of Columbia*, 949 F.2d 127, 129–30 (4th Cir.1991) (quoting *Donovan v. Brown Equip. & Serv. Tools, Inc.*, 666 F.2d 148, 153 (5th Cir. 1982)). "As we have recognized, FLSA exemptions, including this one, "are to be 'narrowly construed against the employers seeking to assert them," and applied only in instances "plainly and unmistakably within the exemptions' terms and spirit." *Morrison v. Cnty. of Fairfax, VA*, 826 .3d 758, 761 (4th Cir. 2016) (quoting *Desmond v. PNGI Charles Town Gaming, L.L.C.*, 564 F.3d 688, 692 (4th Cir. 2009) and *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960)).

"The assertion of an exemption from the mandates of the FLSA is an affirmative defense that is waived if it is not specifically pleaded by a defendant." *Rotondo v. City of Georgetown, S.C.*, 869 F. Supp. 369, 373 (D.S.C. 1994) (citing *Renfro v. City of Emporia*, 741 F. Supp. 887, 888 (D.Kan.1990), *aff'd*, 948 F.2d 1529, 1539 (10th Cir.1991)). *See also Chastain v. Physicians Hair Transplant Ctr., Inc.*, No. 1:20-CV-1315TWT, 2022 WL 19388, at *5 (N.D. Ga. Jan. 3, 2022) (denying defendants' first ground for summary judgment because they failed to plead "an FLSA exemption as an affirmative defense.") *Accord*

*Hunter v. Sprint Corp.*, 453 F. Supp.2d 44, 50 (D.D.C. 2006) ("[FLSA] exemptions are treated as affirmative defenses to liability under the Act, which means that the defendant-employer has the burden of proving that the exemption applies to the plaintiff-employee.")

In *Baltimore Cnty. FOP Lodge 4 v. Baltimore Cnty.*, 565 F. Supp. 2d 672, 675 (D. Md. 2008), the Court agreed with plaintiffs that the defendant county had waived its affirmative defense that plaintiffs were exempt under the "administrative" exemption of the FLSA by failing to plead it specifically in its answer and denied summary judgment to defendants. The Court noted that it refused to elevate "form over substance" and gave the County an opportunity to amend its answer to assert the affirmative defense and found that the prejudice to plaintiffs could be cured by additional discovery. *Id.*

**II. THE COURT ERRED IN FINDING THAT PLAINTIFF FAILED TO PROVIDE EVIDENCE THAT SHE WAS TREATED DIFFERENTLY FROM MALE DEPARTMENT HEADS AND THAT SHE WAS NOT SUBJECTED TO A HOSTILE WORK ENVIRONMENT BECAUSE OF HER SEX WHEN THE EVIDENCE SHOWED SHE COMPLAINED ABOUT BEING BULLIED AND THAT SHE WAS RETALIATED AGAINST FOR ENGAGING IN PROTECTED ACTIVITY.**

In the Court's order, it considered Plaintiff's Title VII and §1983 claims together stating that "in this context the law for each

is the same." JA1940 After reciting the elements of those claims, the

Court then stated:

> To the extent Ms. Hairgrove is asserting a disparate treatment claim, it will be dismissed, both because she has abandoned it and on the merits. While she has offered evidence that she is a member of a protected class, she has not responded to defense arguments directed specifically to the remaining elements. Nowhere in her brief does she discuss whether she suffered an adverse action when she resigned, for example, or whether she was fulfilling her employer's legitimate expectations at the time.

JA1941 The Court followed up by stating:

> On the merits, and in the alternative, the evidence summarized earlier establishes that Ms. Hairgrove resigned and that she was not meeting her employer's legitimate expectations. She has failed to rebut that evidence with any evidence to the contrary. Similarly, her position was filled by women, and she has pointed to no circumstances raising a reasonable inference that her employment was terminated based on her sex.

JA1942 The Court's Order found that Plaintiff only produced

evidence that she was a member of a protected class, JA1941, but

failed to produce evidence that she suffered an adverse action when

she resigned, (termination) or that she was fulfilling her employer's

legitimate expectations (second performance appraisal). The Court

also ignored the evidence presented by Plaintiff that she was treated

differently other male department heads and that she was

48

subjected to a hostile work environment of sufficient severity and pervasiveness to survive a summary judgment motion. Finally, the Court found that Plaintiff had not produced any evidence of protected activity and that "[e]ven if she has shown protected activity, the City and Bailey are entitled to summary judgment," JA1946, because the evidence was that she resigned and she did not show that she was constructively discharged.

### A. **The record contained evidence that Plaintiff suffered an adverse action.**

Plaintiff's brief was limited by the Court's order. JA1929-30 Thus, Plaintiff did not brief issues which Plaintiff considered obvious from the facts in the record, such as the issue of whether she had been subjected to an adverse action. The evidence in the record shows Plaintiff's resignation amounted to a constructive discharge which is an adverse action. After being served with a letter containing accusations of "potentially" criminal conduct on March 17, 2020 JA0754-87, Plaintiff responded to those accusations on April 12, 2020, JA1441-1450. On June 19, 2020, Plaintiff met with Defendant Bailey and learned that he had solicited evaluations from a select group of DSI board members, JA1852-56,¶¶233-241. Two days

later, Plaintiff was given a pre-dismissal letter, JA1856-59,¶¶243-47, as detailed in Plaintiff's affidavit, JA1852-56,¶¶233-242. She also explains that at the time of her predismissal conference, her email had already been turned off and she was asked to turn in her badge to HR. JA1856-58,¶¶243-46. Plaintiff believed this meant the decision had already been made to terminate her.

As discussed below with regard to the evidence of a hostile working environment, the severity and pervasiveness of the conduct alleged should generally be left for the jury as a question of fact. *Mosby-Grant v. City of Hagerstown*, 630 F.3d 326, 335 (4th Cir. 2010) ("[I]n the Fourth Circuit, the question of whether 'harassment was sufficiently severe or pervasive is quintessentially a question of fact.") (citations omitted)). In this case, there is sufficient evidence to show that Plaintiff felt her working conditions were "so intolerable that a reasonable person" in her position "would have felt compelled to resign." *Green v. Brennan*, 578 U.S. 547, 555 (2016). *See also Chapman v. Oakland Living Ctr., Inc.*, 48 F.4th 222, 234 (4th Cir. 2022) (reversing summary judgment on the constructive discharge and hostile work environment issue where the court found a reasonable jury could find that the employer had "either or both

constructive or actual knowledge" of the actions alleged to be hostile and that "its response was insufficient.") The standard of severity is disjunctive with the standard of pervasiveness and where, as here, there is evidence of the pervasiveness of the hostile work environment, even if each incident is not severe, a genuine issue of material fact exists sufficient to defeat summary judgment.

**B. <u>The record contained evidence that Plaintiff's performance was acceptable at the time of her termination.</u>**

Plaintiff's evaluations themselves show that Plaintiff's performance at the time of her termination was acceptable. At the annual review by State officials of the Salisbury Main Street program in June 2019, under Plaintiff's direction, the Salisbury Main Street Program met 85 of the 99 maximum standards for a Main Street program; the minimum number of standards required for accreditation was 59. JA1829 Mayor Heggins noted the "excellent results" of the assessment by Sherry Adams, the state Main Street official. JA1709,¶4

In addition, Plaintiff's performance evaluation in November 2019, JA496-509;JA1837-39, contained numerous positive comments about her performance, including that Plaintiff's

51

performance had "vastly improved over the past four months" and that her "knowledge and work she has done to improve the Main Street Program has been outstanding" and scores of 2.0 in "core competencies" and 2.17 in "department competencies." The one area of low scores (below 2.0) contained comments and scores inconsistent with her January evaluation, JA0483-95, as well as being internally inconsistent with comments. Despite the two 1's she received with regard to her staff management and supervision, Plaintiff's work performance was above average (2.0 and 2.17) Plaintiff also presented a letter of reference from the former Planning Director who worked with Plaintiff while she was with the City. JA1468-69 Likewise, individuals with whom she had worked while with the City offered to give Plaintiff good references if she wanted to stay in public economic development. JA1466

### C. **The record contained evidence that Plaintiff was treated differently from male department heads and subjected to a hostile work environment.**

The Court's order found that Plaintiff claimed "that the City treated her differently than male department heads, but she does not provide evidence to support this claim." JA1943  Likewise, the Court found that "[n]or could any reasonable jury find that the harassment

was 'so severe and pervasive' that it altered the conditions of Ms. Hairgrove's employment and created an abusive work environment." JA1944

### 1. Plaintiff produced evidence as to all of the essential elements of her claim that she was treated differently from Aceves, the male head of the Parks and Recreation department.

The mayor's declaration noted that unlike other department heads, Plaintiff was required to report to the DSI board of directors, JA1709,¶6, not just the City Manager. In reality, Plaintiff did not report to the City Manager, Defendant Bailey, but to Bailey's assistant, Kyle. The mayor also noted that as a department head, Plaintiff should have been reporting to Bailey, and noted that "the down downtown development position should have been a full-fledged city department and should have reported to Lane Bailey from the beginning in order to give the position the support and recognition that it would need to be successful." JA1712,¶19

In addition, Mayor Heggins noted that Plaintiff was subjected to disciplinary action for not meeting performance expectations that no other city employee was required to meet, JA1711,¶12,  and subjected to an evaluation process by the DSI board unlike other City

employees,  JA1711,¶13 She noted City employees like Plaintiff were supposed to be evaluated by their City employee supervisors not by the DSI board.  JA1709-10,¶¶6-10

In fact, this evaluation process was front and center in Bailey's termination letter. Bailey solicited evaluations from the DSI Board, JA1512-62, in May shortly before informing Plaintiff he was going to terminate her and upon which he relied to terminate her, JA0778-0780.

Bailey limited the recipients of his selective solicitation of feedback to DSI board members who were "not City employees." In his predismissal letter, Bailey described the feedback from the evaluations as "demonstrat[ing] an inability to perform your job duties up to my expectations or the DSI Board's expectations." JA0778

In fact, had the Court reviewed the letter and compared it to the content of the actual evaluations, JA1512-62, the Court could have noted that out of the 15 evaluations, not all of which were negative, the most negative ratings came from at least two board members who were the primary authors of the letter alleging Plaintiff had committed wrongdoing with regard to the February closed session recording of

the board meeting which had not been addressed by the City or Bailey. JA1520-22-Young; JA1548-50-Williams, Board members completing the evaluations in Mary 2020 were not provided a copy of Plaintiff's April 17th response to the allegations.

The letter itself shows that Plaintiff was treated differently from Aceves, the Parks&Rec department head. Despite Bailey's statement that he sent the evaluations to non-City employees, he also stated that he reviewed Plaintiff's performance with "City's Parks and Recreation, Communications, and Planning departments, three of the departments that work closely with your department" and which were all City employees. JA0778 Bailey had never asked Plaintiff how helpful these departments were to Plaintiff; but he noted that "[t]hese departments indicated that there is a lack of mutual support from your department, in that these departments are frequently helping your department but there is not the same willingness *or ability* of your department to help theirs." Notably, between 2017 and 2020, these departments had far more employees allocated than did Plaintiff's department. JA1270, 1308, 1365

As for evidence of a hostile environment, texts between Plaintiff and a former employee, Katelin Rice, showed that that Rice also felt

55

treated with bias during her employment, unfavorably compared with the Parks&Rec department, by the City, and that the City had lied to Plaintiff about her opinions of Plaintiff's abilities. JA1464-67

Plaintiff's affidavit detailed occasions on which she was demeaned and belittled by Whitney Williams, JA1869-73, ¶¶275-283, and that when she received her disciplinary action in June 2019, despite having had a successful assessment of her program by the state Main Street officials, she told Kyle and HR that she felt bullied by DSI board members. She met with them on June 25 to discuss these allegations, about which nothing was done. JA1831,¶180 After the March 17, 2020 letter from the DSI board, on April 12, 2020, Plaintiff reiterated her feelings of being bullied and scapegoated. JA1842,¶208;JA1441-50.

Candice Brown's declaration also provided evidence that Plaintiff was treated differently from Aceves, the Parks&Rec department head, in the lack of support she received and in the fact that she was bullied by Kyle and Williams. JA1718-19,¶¶16-20 Evidence of disparate treatment included that Plaintiff was not given the accolades that Aceves had and was expected to support Aceves' department even though he had far more employees than Plaintiff

had. JA1833,¶186

In September 2019, when Plaintiff sought commitment from Aceves on the level of support his department would provide to her, JA1833,¶186, but was ignored, JA1834,¶¶188-189, and Kyle informed Plaintiff that he met with Aceves often, as opposed to Plaintiff, and would obtain information she needed from Aceves when Aceves refused to respond to Plaintiff, JA1834,¶188-89.

Plaintiff testified that she was always treated less favorably than James Meacham, for example, the Tourism Authority Director, who was competitive with Plaintiff. JA1750-53,¶¶14-17 She was not sent an exercise that other Department heads were sent and made to feel as if she was presenting an excuse. JA1754,¶20 In November 2017, Kyle shifted the duty of supervising Plaintiff to the Bailey's administrative assistant, essentially demoting Plaintiff, and causing friction with the DSI Board. JA1760-61,¶¶34-35

Indeed, the Court's opinion itself noted "[i]n its review of the record . . . a comment . . . related to sex: a comment by a DSI board member [Whitney Williams] that Ms. Hairgrove 'needed to be more like' a certain man who worked for the City and who wore 'nice suits.'" JA1943,n8 However, the Court considered that incident "isolated"

and insufficient to show a hostile work environment.

> **2. The evidentiary record showed more than one isolated incident supporting Plaintiff's allegation that the City and DSI created and perpetuated a hostile work environment based on her sex.**

The Court described one incident of discrimination which it identified in the record, which Plaintiff also identified as one of many incidents constituting a hostile work environment, as "isolated." JA1441-50 However, the Court noted "felt board members were harassing her, id. at 9, and treating her as a 'scapegoat,' id. at 6, or 'punching bag.'" JA1944 Moreover, texts between Hairgrove and her former colleague contain many references to a hostile work environment, JA1464-67. In her affidavit, Plaintiff gave examples of the hostile work environment, *e.g.* JA1773,¶57; JA1776,¶63, and discussed their psychological impact on her, JA1830,¶178 ("mental and physical health suffered due to receiving mainly criticisms and constant questioning of my daily activities during in-person meetings, daily texts and emails with" Kyle, Lane, Shields, Williams and Young; JA1830,¶179)("afraid to speak frankly due to fear job in in jeopardy; JA1833,¶185)("working 10-12 hour days with no appreciation or overtime). Even though the record contained evidence

58

of a hostile work environment and one that caused Plaintiff psychological harm, and the Court's order even noted evidence showing a hostile work environment, the Court declined to draw inferences from that evidence in favor of Plaintiff.

As this Court has recently reaffirmed, summary judgment "should be granted only 'if a reasonable jury could [not] return a verdict for the nonmoving party.' This means that we cannot weigh evidence and must draw all reasonable inferences in the light most favorable to the nonmoving party." *Robinson v. Priority Auto. Huntersville, Inc.*, 70 F.4th 776, 780 (4th Cir. 2023) (quoting *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018) In discounting Plaintiff's evidence of a hostile work environment, the Court cited snippets of cases which weighed Plaintiff's evidence and found it lacking, in contradiction of this Court's instruction that evidence should not be weighed.

The Court weighed Plaintiff's evidence about the constant criticism of her work, even though it was recognized as excessive by the state DSI officials, and cited a case snippet for the proposition that "[e]valuation and criticism of one's work performance, while perhaps unpleasant, is not abusive." *Holloway v. Maryland*, 32 F.4th

59

293, 301 (4th Cir. 2022). Likewise, the Court minimized Plaintiff's evidence that the DSI board was rude, angry, and hostile to Plaintiff was not sufficient evidence of a hostile work environment. JA2687

The Court's finding Plaintiff's evidence lacking after weighing it is inconsistent with this Court's decision in *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 285 (4th Cir. 2015) where the Court noted that even one sufficiently degrading and humiliating slur could create a hostile work environment. In this case, Plaintiff's affidavit contained many examples of degrading and humiliating treatment.

The *Boyer-Liberto* Court noted that whether a work "environment is objectively hostile or abusive is 'judged from the perspective of a reasonable person in the plaintiff's position,'" *Id.* (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)) and "is not, and by its nature cannot be, a mathematically precise test," *id.* (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 23 (1993)).

The Court noted that it "requires a showing that 'the environment would reasonably be perceived, and is perceived, as hostile or abusive'; the plaintiff may, but is not required to, establish

60

that the environment is "psychologically injurious." *Id.* (quoting *Harris*, 510 U.S. at 22), which Plaintiff testified it was. The Court explained that the determination is "made 'by looking at all the circumstances,' which 'may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id.* (quoting *Harris*, 510 U.S. at 23. And it is a question for the jury. *Mosby-Grant*, 630 F.3d at 335.

The evidence in the record shows demeaning remarks by Kyle in documents and emails on a repeated basis, such as sending emails to Plaintiff copied to other employees in which he said "If/when I look at your emails . . . I hope you have complied with what is in your last disciplinary action," JA1818; using a reference to "your marketing person" which was "intended to humiliate and degrade" Plaintiff, JA1799; sanctioning the exclusion of Plaintiff from meetings which "belittled and discredited her position," JA1794; auditing Plaintiff's email and keyscans but not other employees and instructing Plaintiff, who at the time lacked staff to respond to all emails and phone calls within the same day or 24 hours; threatening Plaintiff with

termination ("the next time you fail to respond to emails or phone calls, repetitive lateness, or your neglect of duties will lead to suspension or possible termination") JA1800; not addressing other employees' addressing speaking to Plaintiff in a disrespectful tone when reported by Plaintiff, JA1810.

As the *Boyer-Liberto* court also noted, "[i]n measuring the severity of harassing conduct, the status of the harasser may be a significant factor—e.g., "a supervisor's use of [a racial epithet] impacts the work environment far more severely than use by co-equals." *Id.* at 278 (quoting *Rodgers v. W.–S. Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir.1993). The Court explained that "[s]imply put, "a supervisor's power and authority invests his or her harassing conduct with a particular threatening character." *Id.* (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 763 1998)). Even prior to the decisions in *Farragher* and *Ellerth,* the United States Supreme Court noted that "Title VII comes into play before the harassing conduct leads to a nervous breakdown." *Harris*, 510 U.S. at 22 (while "[t]he appalling conduct in Meritor . . . may present some especially egregious examples of harassment . . . [t]hey do not mark the boundary of what is actionable.") A "discriminatorily abusive work

environment," detracts from job performance, discourages employees from remaining on the job, keeps them from advancing in their careers, and "offends Title VII's broad rule of workplace equality." *Id.*

In this case, the Court failed to acknowledge Plaintiff's evidence of a hostile work environment and the fact that the law that imputes harassment to the employer if the harasser is, as in this case, in a supervisory position over Plaintiff, such as Kyle and Williams, the DSI board chair.

> As explained by the court:

> On the one hand, "[i]f the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions." *Vance v. Ball State Univ.*, ––– U.S. ––––, 133 S.Ct. 2434, 2439, 186 L.Ed.2d 565 (2013); *see also Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 333–34 (4th Cir.2003) (en banc) ("[T]he employer may be liable in negligence if it knew or should have known about the harassment and failed to take effective action to stop it."). On the other hand, where the harasser is the victim's supervisor, "different rules apply": The employer is ***strictly liable*** for the supervisor's harassing behavior if it "culminates in a tangible employment action".

*Id.* The evidentiary record shows that Plaintiff reported her belief she was being bullied by DSI in June 2019, JA1831 ¶180, and again after the March 17, 2020 letter, JA0513-36, was written and Defendant

Bailey assumed supervision of Plaintiff, JA1842 ¶209.

Thus, even if DSI is not considered to be in a supervisory position over Plaintiff, but comparable to a "co-worker," Plaintiff's evidence also met the "*Ellerth/Faragher*[5] defense, [which] in essence, imposes a duty on the victim to report her supervisor's harassing behavior to the employer." *Id.* (citing *Barrett v. Applied Radiant Energy Corp.*, 240 F.3d 262, 268 (4th Cir.2001)

As to Kyle's participation in and tacit approval of the hostile work environment as Plaintiff's supervisor, "[t]he employer is strictly liable for the supervisor's harassing behavior if it "culminates in a tangible employment action." *Id.* (citations omitted) Given that Plaintiff reported the harassment and was terminated (a tangible employment action), summary judgment was not appropriate.

### 3. The evidentiary record shows evidence of retaliation for engaging in protected activity.

The evidentiary record shows that Plaintiff complained about the hostile work environment in June 2019 and March 2020 and that she was being treated less favorably than Aceves, *see, e.g.*, JA1834,¶¶188-189. Plaintiff's attempt to get a new MOU in place had

---

[5] *Farragher v. City of Boca Raton,* 524 U.S. 775 (1998)

also been thwarted by Aceves who was not responsive to Plaintiff, but he was not disciplined for that behavior as Plaintiff had been. JA1851,¶¶227-228  In addition, Plaintiff also engaged in protected activity by opposing the violations of the Open Meetings law by the DSI Board. JA1848-50.¶¶220-225

Bailey put a stop to Plaintiff's pursuing unlawful closed session; he instructed her not to send any more emails on June 17, 2020. JA1852,¶230 Bailey then met with her on Friday, June 19th and questioned Plaintiff about listening to the recording and told her about the DSI reviews. JA1853-56,¶¶235-242

On Monday, June 22, 2020, Plaintiff was summoned to another meeting with Bailey during which he informed her he was considering dismissing her. JA0778-80  The letter did not contain any reference to the issue of the closed session meetings but focused on Plaintiff's performance, which had not been an issue since her review in November 2019.  The timing of the termination relative to the accusations by the DSI Board and the further conflict over the closed sessions days prior to her termination show that Plaintiff was terminated for engaging in protected activity, and that the performance reasons for her termination were both discriminatory

65

and pretextual and at least created a genuine issue of material fact.

## CONCLUSION

For the foregoing reasons, Plaintiff requests that the Court reinstate Plaintiff's FLSA claims against DSI and reverse the grant of summary judgment on her FLSA overtime claim and remand this case to the District Court for appropriate proceedings. Plaintiff also requests that the Court reinstate Plaintiff's Title VII and §1983 claims and overturn the Court's award of summary judgment to the Defendants on these issues.

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiff-Appellant requests oral argument if the Court deems oral argument helpful in deciding this case.

This 25th day of April 2024.

/s/ VALERIE L. BATEMAN
Valerie L. Bateman
NEW SOUTH LAW FIRM
209 Lloyd Street, Ste 350
Carrboro, North Carolina 27510
Tel:  919-810-3139
Fax: 919-823-6383
valerie@newsouthlawfirm.com
NC State Bar No. 13417
*Counsel for Plaintiff-Appellant*

**UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**

No. __23-2236__    **Caption:** Hairgrove v. City of Salibury et al

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**
Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

**Type-Volume Limit for Briefs if Produced Using a Computer:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 15,300 words or 1,500 lines. A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type. See Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

**Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words. Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2), 35(b)(2) & 40(b)(1).

**Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6).

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[✓] this brief or other document contains ____12991____ [*state number of*] words

[ ] this brief uses monospaced type and contains _____ [*state number of*] lines

This brief or other document complies with the typeface and type style requirements because:

[ ] this brief or other document has been prepared in a proportionally spaced typeface using _____ [*identify word processing program*] in _____ [*identify font size and type style*]; **or**

[ ] this brief or other document has been prepared in a monospaced typeface using _____ [*identify word processing program*] in _____ [*identify font size and type style*].

(s) Valerie L. Bateman

Party Name Appellant's Counsel

Dated: April 25, 2024

# CERTIFICATE OF SERVICE

**Instructions for Electronic Filers:** For persons filing electronically, CM/ECF serves all registered CM/ECF users, and no certificate of service is required for such service. A certificate of service is required from an electronic filer, however, in the following circumstances:

- To certify that a non-user of CM/ECF has been served;
- To certify that a manual filing (not available in electronic form), has been served;
- To certify that a sealed document has been served;
- To certify that a case-initiating document, such as a petition for review, petition for permission to appeal, or petition for writ of mandamus, has been served.

**Instructions for Paper Filers:** For persons filing in paper form, service must be accomplished outside CM/ECF, and a certificate of service is required for all documents.

Case No. ___23-2226___    Case Caption _Hairgrove v. City of Salisbury et al_

I certify that on ___04/25/2024___, the _Corrected Opening Brief of Plaintiff-Appellant_
                 (date)                                (document title)
was served by [ ] personal delivery; [ ] mail; [ ] third-party commercial carrier; or [ ] email

(with written consent) on the following persons at the addresses or email addresses shown:

(Name and Address or Email Address )
Patrick Flanagan                   Bryan Adams
phf@cshlaw.com                  bryan.adams@vraplaw.com

via ECF                           via ECF

___/S/ Valerie L. Bateman___            ___04/25/2024___
          Signature                             Date