# NO. 23-2236

In The

# United States Court Of Appeals
# For The Fourth Circuit

## LARISSA HARPER HAIRGROVE,

*Plaintiff - Appellant,*

v.

## CITY OF SALISBURY; DOWNTOWN SALISBURY INC.; LANE BAILEY, in his individual and official capacity,

*Defendants - Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
AT GREENSBORO

––––––––––––

## BRIEF OF APPELLEES

––––––––––––

**Steven A. Bader**
CRANFILL SUMNER LLP
**P.O. Box 27808**
**Raleigh, NC  27611**
**(919) 828-5100**

*Counsel for Appellees*
 *City of Salisbury*
 *and Lane Bailey*

**Patrick H. Flanagan**
**Stephanie H. Webster**
CRANFILL SUMNER LLP
**P.O. Box 30787**
**Charlotte, NC  28230**
**(704) 332-8300**

*Counsel for Appellees*
 *City of Salisbury*
 *and Lane Bailey*

**G. Bryan Adams, III**
VAN HOY, REUTLINGER,
 ADAMS & PIERCE, PLLC
**737 East Boulevard**
**Charlotte, NC  28203**
**(704) 375-6022**

*Counsel for Appellee*
 *Downtown Salisbury, Inc.*

GibsonMoore Appellate Services, LLC
206 East Cary Street  ♦  P.O. Box 1460 (23218)  ♦  Richmond, VA  23219  ♦  804-249-7770
www.gibsonmoore.net

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 23-2236        Caption: Larissa Hairgrove v. City of Salisbury

Pursuant to FRAP 26.1 and Local Rule 26.1,

City of Salisbury and Lane Bailey
(name of party/amicus)

who is _____ appellees _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Steven A. Bader          Date: 12-13-2023

Counsel for: City of Salisbury and Lane Bailey

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __23-2236__    Caption: __Hairgrove v. City of Salisbury, et. al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__DOWNTOWN SALISBURY, INC.__
(name of party/amicus)

_____

who is _____Appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
       If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
       If yes, identify all such owners:

USCA4 Appeal: 23-2236

4.   Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?   ☐YES☑NO
     If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)   ☐YES☑NO
     If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?   ☐YES☑NO
     If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.   Is this a criminal case in which there was an organizational victim?   ☐YES☑NO
     If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: _____   Date: _12-4-23_

Counsel for: Appellee Downtown Salisbury, Inc.

- 2 -

**Print to PDF for Filing**

# TABLE OF CONTENTS

**Page:**

TABLE OF AUTHORITIES ...................................................................... iv

STATEMENT OF THE CASE ................................................................. 1

    A.    DSI and Salisbury entered a memorandum of understanding for DSI to manage Salisbury's "Main Street Program" .................................................................... 1

    B.    Hairgrove was hired as the DSI director, an exempt position .............................................................................. 2

    C.    Hairgrove was trained on her exempt status ........................ 2

    D.    Hairgrove's primary duties were managerial ........................ 4

    E.    Hairgrove hired and managed two full-time employees ........ 8

    F.    Hairgrove did not meet job expectations dating back to 2018 ....................................................................................... 9

    G.    Hairgrove recorded the DSI board in closed session ............ 10

    H.    Hairgrove received unsatisfactory job performance feedback ................................................................................. 11

    I.    Hairgrove resigned after she received a pre-dismissal letter ...................................................................................... 12

    J.    Hairgrove sued DSI, Salisbury, and Bailey .......................... 13

ARGUMENT SUMMARY ...................................................................... 15

ARGUMENT ........................................................................................... 17

I.    THIS COURT SHOULD AFFIRM DISMISSAL OF HAIRGROVE'S FLSA CLAIMS AGAINST DSI, AND IT SHOULD AFFIRM SUMMARY JUDGMENT FOR ALL DEFENDANTS ON HAIRGROVE'S NCWHA CLAIMS ..... 18

   A.    Defendants did not waive their executive and administrative exemption defenses ............................ 19

        1.    Hairgrove cannot show unfair surprise .............. 20

        2.    Hairgrove cannot show prejudice ....................... 23

   B.    Hairgrove satisfies the executive exemption .............. 24

        1.    Hairgrove's duties are not in dispute ................ 26

        2.    The DSI board minutes show Hairgrove's primary duties were managerial ........................ 29

        3.    Hairgrove's performance evaluations show her primary duties were managerial ................. 30

        4.    Hairgrove was not a department head in name only, as she claims .................................... 31

        5.    Hairgrove's claims of "micromanagement" do not alter her status as an exempt executive ...... 32

        6.    Hairgrove supervised, hired, and fired employees ........................................................... 34

   C.    Hairgrove satisfies the administrative exemption ...... 34

   D.    Hairgrove's evidence on overtime hours worked does not raise a genuine issue of material fact ........... 37

   E.    Hairgrove cannot assert a claim under the NCWHA against Salisbury or Bailey ........................... 38

II.   THIS COURT SHOULD AFFIRM SUMMARY JUDGMENT FOR DEFENDANTS ON HAIRGROVE'S TITLE VII AND § 1983 CLAIMS ......................................... 38

    A.   Hairgrove did not present a triable claim for sex-based disparate treatment ......................................... 39

        1.   Hairgrove abandoned her claim for sex-based disparate treatment at the district court ..................................................................... 40

        2.   Hairgrove did not forecast evidence of an adverse action ..................................................... 42

        3.   Hairgrove did not forecast evidence that she met her employers' legitimate expectations ....... 44

        4.   Hairgrove did not forecast evidence that the alleged adverse action occurred under circumstances that raise a reasonable inference of unlawful discrimination .................. 46

    B.   Hairgrove did not present a triable claim for sex-based hostile work environment ................................... 48

    C.   Hairgrove did not present a triable claim for retaliation .................................................................... 52

    D.   Hairgrove has abandoned any claim that defendants retaliated against her and sabotaged future employment ........................................................ 54

    E.   Hairgrove has abandoned her individual capacity claims against Bailey .................................................... 54

CONCLUSION ........................................................................... 55

CERTIFICATE OF COMPLIANCE ........................................ 57

CERTIFICATE OF FILING AND SERVICE ........................... 58

# TABLE OF AUTHORITIES

**Page(s):**

**Cases:**

*Aguirre v. Joe Theismann's Rest.,*
     2019 U.S. Dist. LEXIS 238123 (E.D. Va. Dec. 3, 2019) ........... 32-33

*Anderson v. Liberty Lobby, Inc.,*
     477 U.S. 242 (1986) ...................................................... 17

*Anderson v. Westinghouse Savannah River Co.,*
     406 F.3d 248 (4th Cir. 2005) ......................................... 44

*Autry v. North Carolina Dep't of Human Res.,*
     820 F.2d 1384 (4th Cir. 1987) ........................................ 38

*Balt. County Fop Lodge 4 v. Balt. County,*
     565 F. Supp. 2d 672 (D. Md. 2008) ................................. 19

*Bostic v. Rodriguez,*
     667 F. Supp. 2d 591 (E.D.N.C. 2009) .............................. 55

*Boyer-Liberto v. Fontainebleau Corp.,*
     786 F.3d 264 (4th Cir. 2015) .................................... 50, 51

*Brinkley v. Harbour Rec. Club,*
     180 F.3d 598 (4th Cir. 1999) ........................................ 19

*Bryant v. Aiken Reg'l Med. Ctrs. Inc.,*
     333 F.3d 536 (4th Cir. 2003) ........................................ 52

*Burlington Indus., Inc. v. Ellerth,*
     524 U.S. 742 (1998) .............................................. 42, 51

*Carter v. Ball,*
     33 F.3d 450 (4th Cir. 1994) ...................................... 43, 48

iv

*Davis v. Durham Mental Health Developmental Disabilities Substance Abuse Area Auth.*,
  320 F. Supp. 2d 378 (M.D.N.C. 2004)..............................................55

*DeMasters v. Carilion Clinic*,
  796 F.3d 409 (4th Cir. 2015) ....................................................53

*Doe ex rel. Johnson v. S.C. Dep't of Soc. Servs.*,
  597 F.3d 163 (4th Cir. 2010)....................................................55

*E.E.O.C. v. Sunbelt Rentals, Inc.*,
  521 F.3d 306 (4th Cir. 2008) ....................................................51

*Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*,
  53 F.3d 55 (4th Cir. 1995) ......................................................39

*Evans v. Int'l Paper Co.*,
  936 F.3d 183 (4th Cir. 2019) ....................................................51

*Faragher v. City of Boca Raton*,
  524 U.S. 775 (1998) ..........................................................51, 52

*Felty v. Graves-Humphreys Co.*,
  818 F.2d 1126 (4th Cir. 1987) ..................................................38

*Gairola v. Virginia Dep't of General Services*,
  753 F.2d 1281 (4th Cir. 1985) ..................................................39

*Harris v. Forklift Sys., Inc.*,
  510 U.S. 17 (1993) .............................................................51

*Hawkins v. PepsiCo, Inc.*,
  203 F.3d 274 (4th Cir. 2000) ...................................................47

*Hill v. Se. Freight Lines, Inc.*,
  877 F. Supp. 2d 375 (M.D.N.C. 2012), *affirmed,*
  523 Fed. Appx. 213 (4th Cir. 2013)............................................44

*Hoyle v. Freightliner, LLC*,
  650 F.3d 321 (4th Cir. 2011) ...................................................42

*In re Under Seal,*
    749 F.3d 276 (4th Cir. 2014) ........................................ 41

*James v. Booz-Allen & Hamilton, Inc.,*
    368 F.3d 371 (4th Cir. 2004) ............................... 42, 43, 48

*JTE Constructors of N.C., Inc. v. United States Fid. & Guar. Co.,*
    2003 U.S. Dist. LEXIS 22301 (M.D.N.C. Nov. 26, 2003).............. 19

*Lane v. Sys. Application & Techs., Inc.,*
    2015 U.S. Dist. LEXIS 27422 (D. Md. March 6, 2015) ................. 35

*Lovo v. Am. Sugar Ref., Inc.,*
    2018 U.S. Dist. LEXIS 139543 (D. Md. Aug. 17, 2018) ................ 35

*Luciano v. Olsten Corporation,*
    110 F.3d 210 (2d Cir. 1997)............................................. 47

*McIver v. Bridgestone Ams., Inc.,*
    42 F.4th 398 (4th Cir. 2022)........................................... 53

*McVay v. Mayflower Vehicle Sys.,*
    2008 U.S. Dist. LEXIS 142432
    (S.D. W. Va. July 31, 2008) ................................. 26-27, 32

*Morrissey v. CES Computer Enhancement Systems, Inc.,*
    2023 WL 2432838 (March 9, 2023)................................. 24

*Oncale v. Sundowner Offshore Servs., Inc.,*
    523 U.S. 75 (1998) ..................................................... 51

*Patten Grading & Paving, Inc. v. Skanska USA Bldg., Inc.,*
    380 F.3d 200 (4th Cir. 2004) ......................................... 19

*Pforr v. Food Lion, Inc.,*
    851 F.2d 106 (4th Cir. 1988) ......................................... 37

*Pueschel v. Peters,*
    577 F.3d 558 (4th Cir. 2009) ......................................... 17

*Roberts v. Glenn Indus. Grp., Inc.*,
    998 F.3d 111 (4th Cir. 2021) ...................................................... 49

*Robinson v. Priority Auto. Huntersville, Inc.*,
    70 F.4th 776 (4th Cir. 2023) ................................................. 48, 49

*S. Walk at Broadlands Homeowners Ass'n, Inc. v.*
*OpenBand at Broadlands, LLC*,
    713 F.3d 175 (4th Cir. 2013) ...................................................... 53

*Sempowich v. Tactile Sys. Tech., Inc.*,
    19 F.4th 643 (4th Cir. 2021) ............................................. 40, 45, 46

*Smith v. Schlage Lock Co., LLC*,
    986 F.3d 482 (4th Cir. 2021) ...................................................... 38

*Sony Music Ent. v. Cox Commc'ns, Inc.*,
    93 F.4th 222 (4th Cir. 2024) ...................................................... 41

*Taylor v. HD & Assocs., L.L.C.*,
    45 F.4th 833 (5th Cir. 2022) ...................................................... 24

*Thomas v. Speedway SuperAmerica, LLC*,
    506 F.3d 496 (6th Cir. 2007) ...................................................... 33

*United States v. Holness*,
    706 F.3d 579 (4th Cir. 2013) ................................................. 54, 55

*United States v. Zayyad*,
    741 F.3d 452 (4th Cir. 2014) ...................................................... 41

*Univ. of Texas Sw. Med. Ctr. v. Nassar*,
    570 U.S. 338 (2013) ................................................................. 54

*Walton v. Harker*,
    33 F.4th 165 (4th Cir. 2022) ...................................................... 52

*Ward v. Family Dollar Stores, Inc.*,
    2012 U.S. Dist. LEXIS 126052 (W.D.N.C. Aug. 24, 2012) ............. 33

*Williams v. Giant Food Inc.*,
    370 F.3d 423 (4th Cir. 2004) .................................................... 54, 55

*Wright v. Collins*,
    766 F.2d 841 (4th Cir. 1985) ........................................................ 55

**Statutes:**

29 U.S.C. 201-219 ("FLSA") ............................................. *passim*

29 U.S.C. § 207(a)(1) ............................................................ 25

29 U.S.C. § 213(a)(1) ............................................................ 25

42 U.S.C. § 1983 ............................................................ *passim*

42 U.S.C. § 2000e ("Title VII) ......................................... *passim*

N.C. Gen. Stat. § 95-25.1 ("NCWHA") .......................... *passim*

N.C. Gen. Stat. § 95-25.4(a) .................................................. 25

N.C. Gen. Stat. § 95-25.14(b)(4) ...................................... 18, 25

N.C. Gen. Stat. § 95-25.14(d) ................................................ 38

N.C. Gen. Stat. § 95-25.22 .................................................... 18

**Regulations:**

29 C.F.R. §§ 541.100(2)-(4) .................................................. 21

29 C.F.R. § 541.100(a) .................................................... 25, 35

29 C.F.R. § 541.200(a)(2) ...................................................... 35

29 C.F.R. § 541.200(a)(3) ...................................................... 36

29 C.F.R. § 541.201(b) .......................................................... 35

29 C.F.R. § 541.202(b) .......................................................... 36

29 C.F.R. § 541.600 .................................................................. 25

29 C.F.R. § 541.700(a) ................................................... 26, 31, 32

29 C.F.R. § 541.700(b) ....................................................... 26, 32

**Rules:**

Fed. R. App. P. 28(a)(8)(A) ............................................ 43, 49, 54

Fed. R. Civ. P. 56(a) ................................................................ 17

**Other Authorities:**

WHD Op. Ltr. FLSA 2006-34 (Sept. 21, 2006) ....................................... 36

WHD Op. Ltr. FLSA 2009-04 (Jan. 14, 2009) ......................................... 36

84 FR 51306 (Sept. 27, 2019) ..................................................... 25

**STATEMENT OF THE CASE**

A.  <u>DSI and Salisbury entered a memorandum of understanding</u>
<u>for DSI to manage Salisbury's "Main Street Program"</u>

Downtown Salisbury, Inc. (DSI) is a quasi-governmental 501(c)(3) nonprofit organization formed in the early 1980's "[t]o promote, enhance and manage the development of the central business district of Salisbury, … by improving and expanding the district to become the economic, governmental, social and cultural center of Rowan County." (JA0812) DSI is an accredited "Main Street Program." (*Id.*) DSI is managed by a full-time director, and it has a 21-person board of directors. (JA0718, JA0812)

On June 16, 2017, Salisbury and DSI entered a memorandum of understanding ("MOU") for DSI to manage and operate Salisbury's Main Street Program. (JA0585-587) The DSI director was a city department head who reported to the assistant city manager. (*Id.*) DSI operated within guidelines set by the Main Street Program, and this included establishing four specific committees devoted to Design, Economic Restructuring, Organization and Promotions. (*Id.*)

B.    Hairgrove was hired as the DSI director, an exempt position

In May 2017, Larissa Hairgrove applied for the DSI director position. (JA0048-49, JA0671-672, JA0798-800) Salisbury offered her the job. (*Id*.; JA0801-802) The offer letter described the director role as "a salary/exempt position." (JA0801) Hairgrove accepted the offer on August 28, 2017. (*Id*.; JA0801-802).

Hairgrove's initial salary was $75,000.12 per year paid in bi-weekly installments of $2,884.62. (*Id*.) Her pay grade was 30. (JA0581-583) Hairgrove's salary was $80,000 when she resigned in June 2020. (JA0672-673, JA0892) Hairgrove remained the director throughout her employment. (JA0745) She was never demoted, and her compensation and benefits were never reduced. (*Id*.)

C.    Hairgrove was trained on her exempt status

Hairgrove went through orientation on October 11, 2017. In this process, she signed a "Statement of Understanding" in which she acknowledged, *inter alia*, "I have been told the FLSA status of my position and I understand the overtime policy as it relates to me." (JA0673-678, JA0888) Hairgrove underlined this statement and understood she was not eligible for overtime. (*Id*.)

Hairgrove also received a copy of Salisbury's employee handbook during her orientation. (JA0733, JA0888, JA0937) Hairgrove understood its "Wage and Hour Policies," which stated that exempt employees would not receive overtime compensation if they worked more than 40 hours in a week. (JA0734-735, JA0928-929) Pursuant to the "Recording Time" policy, Hairgrove was required to notify Salisbury about any "pay discrepancies, unrecorded or misreported work hours, or any involuntary missed meal or break periods." (JA0930) Hairgrove never used Salisbury's complaint form (attached to the handbook) to report any such issues. (JA0735-736, JA0743-744, JA0973)

Hairgrove completed weekly time sheets that were submitted to Salisbury. (JA0746-747, JA0975-1041) These time sheets showed that Hairgrove worked 37.5 hours per week. (JA0732, JA0975-1041) Hairgrove never disputed them. (*Id.*)

In March 2019, more than a year into her employment as DSI director, Hairgrove received additional training on the Fair Labor Standards Act. (JA0737-742, JA0938-972) This training addressed employee misclassification, among other things. (*Id.*) Hairgrove never claimed to be misclassified. (*Id.*)

D.   Hairgrove's primary duties were managerial

As the DSI director, Hairgrove was a city department head in charge of DSI's daily operations. (JA0892) Her responsibilities, accomplishments and goals are memorialized in DSI board meeting minutes, along with Hairgrove's own work product. (JA0589-626, JA0713-714, JA0821-0828, JA1087-1103)

Hairgrove built a new department and merged economic development duties through a new quasi-governmental structure. (JA0680, JA0892) In her view, she "really had to clean up the whole structure, put . . . systems in place that weren't in place. . . I was hired to develop a department, a City department, the way I knew how. That's what I was hired to do, and to be the executive director to this nonprofit partner arm." (JA0645-646)

To develop her department, Hairgrove trained DSI board members and staff on how to run the DSI office through its new quasi-governmental structure. (JA0644, JA0647, JA0650-654, JA0663-664, JA0723, JA0725-726, JA0892) Hairgrove described herself as "a full time Executive Director who overs[aw] the progress and purpose of the organization." (JA0718) Her job was "to assist with getting the whole

4

overall [DSI work] plan done and . . . directing the development of the downtown," including building redevelopment and ensuring that her staff was present at DSI events. (JA0642-643)

Hairgrove responded to Salisbury's request for proposal (RFP) regarding future management of the Main Street Program. (JA0718-720, JA0812-820) This RFP was crucial for DSI to continue to receive Municipal Service District funds for its programming. (*Id.*)

Hairgrove was responsible for enhancing the downtown municipal service district through business retention, recruitment, property development, marketing and memorable events, and North Carolina Main Street reporting and assessment. (JA0655, JA0695-696, JA0892) She "[w]orked extensively with the Planning & Community Development Department with consultants on a downtown parking study, market study, updating the Downtown Master Plan and other internal and external programs and projects." (JA0696)

Hairgrove led monthly meetings of the DSI board and its four committees. (JA0648-649, JA0697-698, JA0705, JA0815, JA0892) She presented her director's report at each board meeting. (JA0704, JA0729-730, JA0825) Hairgrove also attended the committee meetings "because

5

[she] was overseeing this" and they frequently needed her to make decisions or provide direction. (JA0698) Hairgrove reported to the board on the committees' activities. (JA0719) Each DSI committee had its own mission that complimented Hairgrove's managerial duties. (JA0648, JA0697-698, JA0718, JA0815, JA0892)

Hairgrove attended weekly city department head meetings that included all heads, City Manager Lane Bailey, Assistant City Manager Zack Kyle, and the city attorney. (JA0648-649, JA0691-692) She also attended the city council's bi-weekly meetings to provide updates on DSI's projects. (JA0703-704) Hairgrove submitted work plans and goals/objectives lists to the DSI board and Assistant City Manager Kyle. (JA0722-731, JA0821-828, JA1087-1103)

Given her position, Hairgrove was evaluated on her managerial duties, including development, direction and training of employees, business recruitment and property development, carrying out "duties expected of a Department Head," "work[ing] with the Empire Hotel Development Team to secure executed contracts, coordinate with contractors, consultants, city staff, and City Council to implement the

closing transaction," and "[d]irect[ing] the overall economic development program of work for" DSI. (JA0483-509)

Hairgrove was the main contact point between the public and DSI. She frequently met with "stakeholders" (businesses and property owners) to "find out what their needs are" because "it was part of the job." (JA0700-701) Once she determined the stakeholders' needs, she would connect them with a DSI committee for further assistance. (*Id.*) Hairgrove's goal was to "build a relationship with each retailer and brainstorm ideas for growing their business." (JA0725, JA0822)

Hairgrove oversaw a $347,000 total budget for both DSI and Salisbury. (JA0680, JA0728) She had to ensure that the budget plan "align[ed] with the economic development plan and general operations of the MS organization." (JA0725, JA0822) Hairgrove was responsible for "staying within budget, cutting for efficiency and conservation of funds when needed." (JA0696) She managed DSI's books and worked with CPAs on DSI audits. (JA0728) Hairgrove prepared Form 990's as part of DSI's annual financial reporting. (JA0730-731)

In addition, Hairgrove had to prepare and submit annual reports to the North Carolina Main Street office that described DSI

accomplishments and ongoing projects. (JA0726-727, JA0823) Hairgrove secured a $543,000 federal historic redevelopment grant and a $10,000 to $20,000 EPA/USDA Local Foods grant in 2020. (JA0647, JA0708-710, JA0729, JA0824, JA0892) She also applied for a $1,000,000 RISE grant for the redevelopment of the Empire Hotel. (JA0708-710)

E.    Hairgrove hired and managed two full-time employees

Hairgrove managed two full-time employees, events and marketing coordinator LaToya Price and administrative specialist Candice Brown. (JA680-681) Price and Brown began their employment in October 2018. (*Id.*, JA0628) Price was still employed when Hairgrove resigned. (*Id.*) Brown resigned in April 2020. (*Id.*) Price's pay grade was 18 and Brown's was 15. (JA0581)

For both positions, Hairgrove received and reviewed resumes and applications, decided who to interview, conducted interviews, and then selected Price and Brown for their respective positions. (JA0681-687) Hairgrove also created the events and marketing coordinator position and advertised for it. (*Id.*)

Hairgrove supervised, counseled, and disciplined her staff. (JA0693-694) She conducted performance evaluations and delegated

8

duties as she deemed necessary. (JA0642-643, JA0646, JA0691-692, JA0720) Hairgrove also conducted a pre-dismissal hearing with a staff member. (JA0668) Hairgrove also supervised two interns, Katelin Rice and Jordan Ferguson. (JA0815, JA0688)

F.    <u>Hairgrove did not meet job expectations dating back to 2018</u>.

Assistant City Manager Kyle and DSI board members expressed concerns about Hairgrove's performance throughout her tenure as director. On December 19, 2018, Kyle issued Hairgrove a disciplinary action report that documented "lateness" and "failure to follow instructions," among other concerns. (JA0481)

Hairgrove had a performance review on January 18, 2019. (JA0483) Hairgrove received an "unsatisfactory" rating in four categories, including "ethics, values, and stewardship," "relationships," and "planning and organization." (JA0483-492)

A month later, on February 25, 2019, DSI board members raised concerns about Hairgrove's job performance. (JA0512). Among other things, Hairgrove did not respond to emails, she was late and unprepared for meetings, and she told the board she was too busy to handle tasks assigned to her. (*Id.*)

On June 18, 2019, Hairgrove was issued another disciplinary action report for "lateness," "failure to follow instructions," and "unsatisfactory work quality." (JA0510) Hairgrove had a follow-up performance review on November 13, 2019. (JA0496) Again, she received four "unsatisfactory" ratings. (JA0496-509)

G.     Hairgrove recorded the DSI board in closed session.

On February 25, 2020, the DSI board held a regular meeting with Hairgrove in attendance. (JA0513-514, JA1444). At the end of the meeting. the board went into closed session. (JA0513-514) Hairgrove left a recording device in the room that captured the closed session. (JA1444) The board located the device, and board member Diane Young returned it to Hairgrove a day or so later. (JA0517, JA1445)

On March 17, 2020, the DSI board sent a letter to City Manager Bailey, Assistant City Manager Kyle, and the city attorney that described Hairgrove's non-consensual recording. (JA0513-520) The board felt that Hairgrove had committed a "deliberate breach of the Board's trust" and that her "actions were dishonest" and "show[ed] a lack of integrity and good character." (JA0519) The board took the position that Hairgrove should have been suspended for her conduct. (*Id.*) The board felt it "ha[d]

been placed in a difficult situation of continuing to work with an Executive Director who we hold in contempt." (*Id.*) They did "not see a workable scenario where the existing Board remains intact with the current Executive Director [Hairgrove]." (*Id.*)

A month later, on April 12, 2020, Hairgrove submitted a written response. (JA1441-1450) Hairgrove tried to justify her recording by arguing that the closed session was illegal. (JA1441, JA1447-1449) She also complained about the DSI board, in general, and described a "battering of emails, condescending remarks, and finger-pointing at me for any real or unreal action of 'nonperformance,'" among other complaints. (JA1442-1443) Hairgrove never complained about sex-based discrimination in this 10-page response. (JA1441-1450)

H.     <u>Hairgrove received unsatisfactory job performance feedback</u>.

After the DSI board raised its concerns, City Manager Bailey asked Hairgrove to report directly to him. (JA0778) Bailey then asked DSI board members to provide feedback on Hairgrove's performance so that he could conduct his own review. (JA0778, JA0300-301)

Thirteen DSI board members provided feedback in different areas. (JA0778) Hairgrove received "39 ratings of below expectations, 35 ratings

11

of meets expectations, and only 4 ratings of exceeds expectations."
(JA0778, JA1512) Put another way, Hairgrove had the same number of
"below expectations" ratings as she did "meets" or "exceeds expectations"
ratings. (*Id*.) One board member wrote that "[h]aving to carry on with
[Hairgrove] as ED would unquestionably lead to a series of resignations
from the Board," and another wrote that "[t]he board has lost all
confidence and trust and is no longer willing to work with her." (JA1514,
JA1516) Bailey solicited feedback about Hairgrove from employees in
parks and recreation, communications, and planning, and that feedback
was negative as well. (JA0778)

I.     Hairgrove resigned after she received a pre-dismissal letter.

Based upon this feedback, City Manager Bailey prepared and
delivered a pre-dismissal letter to Hairgrove on June 22, 2020. (JA0884,
JA0201-202) The letter informed Hairgrove that she may be dismissed
"based on a pattern of performance deficiencies." (JA0778-780) Bailey
scheduled a meeting with Hairgrove for two days later, on June 24, 2020.
(*Id*.)

Before that meeting could occur, on June 23, 2020, Hairgrove resigned and claimed a "hostile work environment and work place harassment," with no specifics. (JA0749, JA0565, JA0125-126)

Salisbury accepted Hairgrove's resignation on June 24, 2020. (JA0565) In that same letter, Salisbury expressed concern about Hairgrove's allegations. (*Id.*) It asked Hairgrove to provide details about her allegations so that it could investigate. (*Id.*) Hairgrove did not respond. (JA0566) Salisbury followed up on August 28, 2020. (*Id.*) Again, Hairgrove did not respond. (JA0132-134)

Latoya Price filled Hargrove's position on a temporary basis after Hairgrove resigned. (JA0156) Sada Troutman was later hired as Hairgrove's permanent replacement. (*Id.*) Both Price and Troutman are female. (*Id.*)

J.    Hairgrove sued DSI, Salisbury, and Bailey

On February 11, 2022, Hairgrove filed an amended complaint against DSI, Salisbury, and City Manager Bailey, in both his official and individual capacities. (JA0046-71) She sued raising the following claims:

(1)    Title VII, sex-based discrimination and hostile work environment;

13

(2)    Title VII, retaliation for complaining about sex-based discrimination and hostile work environment;

(3)    Wage and hour violations contrary to the North Carolina Wage and Hour Act and the Fair Labor Standards Act;

(4)    A sex-based equal protection violation under 42 U.S.C. § 1983 and a North Carolina *Corum* claim; and

(5)    Title VII, post-employment retaliation for complaining about sex-based discrimination and hostile work environment.

(JA0046-71)

The district court dismissed Hairgrove's FLSA claims and Title VII claims against DSI by order dated March 29, 2024. (JA0088-90) The district court granted the defendants' respective motions for summary judgment on the remaining claims by order dated September 14, 2023. (JA1931-1954)

## ARGUMENT SUMMARY

Hairgrove was hired as the DSI director, a city department head with managerial oversight for the DSI program. Hairgrove acknowledged that the DSI director was an exempt position. The job was demanding. And, in the end, it proved too much for Hairgrove. So, she resigned. Then, after her resignation, Hairgrove sued and made claims that she never even hinted at during her employment. In discovery, Hairgrove attempted to rewrite her job duties to prop-up a claim for overtime pay under the FLSA and the NCWHA. She also recast her performance issues as claims for gender-based discrimination under Title VII and 42 U.S.C. § 1983. The undisputed evidence, however, shows no genuine issues of material fact. In turn, this Court should affirm summary judgment for defendants.

***

Hairgrove argues that her wage and hour claims should be reinstated because defendants waived the executive and administrative exemptions in both the FLSA and the NCWHA. This procedural maneuver lacks support in fact and law. From a factual standpoint, the sole focus with Hairgrove's wage and hour claims has been the executive

and administrative exemptions. They were raised in Hairgrove's complaint and the responsive pleadings. These issues have been paramount in discovery and dispositive motions. Hairgrove has no straight face argument that the defense waived these exemptions. From a legal standpoint, Hairgrove cannot show surprise or prejudice, which is required before a defense is deemed waived.

Most important, the undisputed record evidence shows that Hairgrove met the criteria for both exemptions. Among other things, Hairgrove earned a sufficient wage, her primary duties were managerial, she oversaw at least two employees, and she had the authority to hire and terminate. Her argument to the contrary – that she felt micromanaged by those above her – does not create a factual dispute for trial.

***

Hairgrove's discrimination claims are constructed on speculation and guesswork. The undisputed record shows that Hairgrove had long-standing performance issues that culminated in a request to meet with City Manager Bailey to discuss whether she could continue as DSI director. At that point, Hairgrove resigned.

Under both Title VII and § 1983, Hairgrove must forecast evidence that her employer took an adverse action against her, that she was fulfilling its legitimate expectations at the time, and that the circumstances infer discrimination. Hairgrove has not forecast any such evidence. To the contrary, the undisputed record shows that Hairgrove resigned when she was *not* fulfilling her employer's expectations.

***

Hairgrove had a rocky tenure as DSI director. But that does not mean she has a triable lawsuit against DSI, Salisbury, and Bailey. This Court should affirm summary judgment for defendants.

## ARGUMENT

Summary judgment is reviewed *de novo*. *Pueschel v. Peters*, 577 F.3d 558, 563 (4th Cir. 2009). It shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it might affect the outcome. *Id.*

Hairgrove has not forecast evidence that reveals a genuine issue of material fact on her claims. Summary judgment should be affirmed.

I.    THIS COURT SHOULD AFFIRM DISMISSAL OF HAIRGROVE'S FLSA CLAIMS AGAINST DSI, AND IT SHOULD AFFIRM SUMMARY JUDGMENT FOR ALL DEFENDANTS ON HAIRGROVE'S NCWHA CLAIMS

Hairgrove is fixated on the district court's dismissal of her FLSA claim on the grounds that she failed to plead that DSI was engaged in interstate commerce. (*See* Doc 55, Opening Brief 30-33, 39-40) This argument is misplaced given the district court's ruling on summary judgment. The fact is, Hairgrove's claim under the NCWHA provides the same remedies as the FLSA, and therefore, whether she pursued her overtime claims under the FLSA or the NCWHA does not matter because the executive and administrative overtime exemptions can be asserted under both statutes. *See, e.g.* N.C. Gen. Stat. § 95-25.14(b)(4) (2-year statute of limitations), § 95-25.22 (remedies). The probative question is whether defendants waived these exemptions and, if not, whether they bar Hairgrove's overtime claims.

A.  <u>Defendants did not waive their executive and administrative exemption defenses</u>

Defendants raised executive and administrative exemptions in their pleadings. DSI first raised the issue in its motion to dismiss (JA0072). Defendants raised the exemptions again in their respective answers. (JA0079[1]; JA0094[2])

More than that, an affirmative defense is not waived as a legal point "absent unfair surprise or prejudice." *Patten Grading & Paving, Inc. v. Skanska USA Bldg., Inc.*, 380 F.3d 200, 205 (4th Cir. 2004). Indeed, "it would elevate form over substance to deny [Defendants] the opportunity to present all of [their] legal arguments." *Balt. County Fop Lodge 4 v. Balt. County*, 565 F. Supp. 2d 672, 675 (D. Md. 2008). As such, even a defense that appears for the first time in a summary judgment motion is not waived if the plaintiff had "fair warning" the defense may arise. *Brinkley v. Harbour Rec. Club*, 180 F.3d 598, 612-613 (4th Cir. 1999). *See also JTE Constructors of N.C., Inc. v. United States Fid. & Guar. Co.*, 2003 U.S. Dist. LEXIS 22301, *12-13 (M.D.N.C. Nov. 26, 2003).

---

[1] Salisbury and Bailey admitted that Hairgrove was an exempt employee.
[2] DSI also admitted that Hairgrove was an exempt employee.

Hairgrove has not either surprise or prejudice to support her waiver argument, as discussed below.

### 1. Hairgrove cannot show unfair surprise

Hairgrove's salaried exempt status, and the executive and administrative exemptions, was the principal defense against her wage claims. This is shown in her amended complaint, discovery responses, deposition testimony and her summary judgment affidavit.

In her complaint and amended complaint, Hairgrove acknowledged that she was classified as a salaried, exempt department head. (JA0017, JA0050). DSI responded with a motion to dismiss Hairgrove's overtime claim on the grounds that she was a salaried, exempt employee, and ineligible for overtime compensation. (JA0072-74). All defendants admitted Hairgrove was an exempt employee in their respective answers. (JA0079, JA0094) As the case progressed, it became clear that Hairgrove satisfied the executive exemption, and all parties and counsel understood that this exemption was central to the litigation.

On May 24, 2022, DSI served written discovery on Hairgrove. Interrogatory No. 9 requested the following: "Describe in detail the factual basis for your contention that you were not in fact a salaried

exempt employee." (JA0911-913) Hairgrove responded by citing and discussing the three elements of the executive exemption duties test: "plaintiff was not allowed to: manage the downtown development department; direct the work of at least two or more other full-time employees or their equivalent; [or] have the authority to hire or fire other employees or be deferred to in such matters." *Id.*; *See* 29 C.F.R. §§ 541.100(2)-(4). Hairgrove did not even reference the administrative exemption in this response. *Id.*

In her deposition, Hairgrove embraced the fact that various documents and circumstances affirmed her salaried exempt status as DSI's director. Her initial onboarding employment documents referred to her position as salaried/exempt and her pay grade was consistent with a department head. (JA0580-583 (pay grades noting exempt status), JA0584-587 (memorandum of understanding referring to her position as a department head), JA0801-803 (offer letter – "salaried/exempt position") (emphasis in original))[3]

---

[3] Hairgrove testified about these documents as well. (JA0671-678, JA0744-745)

Hairgrove acknowledged she was informed of the FLSA status of her position and that she understood "the overtime policy as it relates to me." (JA0676-677) Hairgrove appreciated the meaning of being a salaried exempt employee by virtue of her previous employment as a salaried exempt Downtown Business Specialist for the City of Wilson, North Carolina. (JA0675, JA0889-891)

In her corrected summary judgment affidavit (JA1742-1898), Hairgrove acknowledged that the executive and administrative exemptions were part of this lawsuit. (*Compare* JA1801 ¶ 111 ("I was never told at any time that I was exempt as either an administrative employee *or as an executive employee*") (emphasis added) *with* JA0671-675 (she was hired into a "salary/exempt position"). Indeed, Hairgrove underlined the following in her signed Statement of Understanding: "I have been told the <u>FLSA status of my position and I understand the overtime policy</u> as it relates to me." (JA0888 (emphasis in original))

Hairgrove also understood the significance of her status as a department head and the moment in October 2018 when she first had two full-time staff reporting to her, as demonstrated throughout the record. (JA1745 ¶4 (Bailey was going to send her to Public Executive

Leadership training), JA1746 ¶7 (her salary range was the same as the Parks & Recreation Director and Communications Director), JA1762 ¶37 (she hired 2 staff members in October 2018), JA1769 ¶50 (she was operating a new City department and running a nonprofit), JA1771 ¶¶53-54 (two full-time staff coming in October 2018), JA1774 ¶60 (same), JA1779 ¶70 (referring to herself as an "experienced Director"), JA1805 ¶118 (she attended FLSA training "as a manager with 2 full-time staff"), JA1815 ¶ 140 (referring to herself as "Downtown Executive Director, and my two staff members"), and JA1829 ¶175 (DSI met Main Street Standards "due to my direction over the first year")).

All told, the evidence does not show Hairgrove was surprised by the defenses.

### 2.    Hairgrove cannot show prejudice

Here, while Hairgrove gives lip service to the concept of prejudice, she does not advance a valid argument supported by facts that she was unduly prejudiced because defendants asserted the executive exemption. (Doc 55, Opening Brief 34-39)

Instead, she recycles her tired argument that Salisbury "refused" to produce various items in their January 2023 discovery responses, but

23

any prejudice resulting therefrom is her own fault, because she never followed up on this or filed a motion to compel. *Id.* at 38.

The U.S. District Court in Maryland recently rejected a threadbare prejudice argument like Hairgrove's, where a "technical failure" to plead an exemption as an affirmative defense did not result in waiver because "[h]ow and how much" plaintiffs were paid "was clearly at issue" in the case. *Morrissey v. CES Computer Enhancement Systems, Inc.*, 2023 WL 2432838 *3 (March 9, 2023) (citing *Taylor v. HD & Assocs., L.L.C.*, 45 F.4th 833, 838-39 (5th Cir. 2022)).

Given that the parties litigated the exemptions from this case's inception, Hairgrove has not shown she was prejudiced by the defenses either.

And, on the merits, Hairgrove satisfies both the executive exemption and the administrative exemption such that her FLSA and NCWHA claims both fail.

B.    Hairgrove satisfies the executive exemption

Both the FLSA and the NCWHA require an employer to "pay each employee who works longer than 40 hours in any workweek at a rate of not less than time and one half of the regular rate of pay of the employee

24

for those hours in excess of 40 per week." N.C. Gen. Stat. § 95-25.4(a); *see* 29 U.S.C. § 207(a)(1). But these provisions do not apply to certain "executive" employees. *See* 29 U.S.C. § 213(a)(1); N.C. Gen. Stat. § 95-25.14(b)(4) (adopting the definitions of the FLSA for this exemption).

Under the FLSA, an exempt executive employee is any employee:

(1)    Compensated on a salary basis . . . at a rate of not less than $684 per week[4] . . .;

(2)    Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;

(3)    Who customarily and regularly directs the work of two or more other employees; and

(4)    Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 C.F.R. § 541.100(a).

It is undisputed that Hairgrove satisfied the first element throughout her employment. (JA0672-673, JA0800, JA0892)

To decide if work is exempt, courts consider "the relative importance of the exempt duties as compared with other types of duties;

---

[4] Before January 1, 2020, the figure was a salary exceeding $455 per week. *See* 29 C.F.R. § 541.600; 84 FR 51306 (Sept. 27, 2019).

the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee." 29 C.F.R. § 541.700(a). Employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement." 29 C.F.R. § 541.700(b).

Hairgrove provides very little support for her position that she did not satisfy the executive exemption other than the conclusory arguments that she did not have two full-time employees until October 2018, that she was not evaluated in January 2019 on her supervisory abilities, and the unfounded contention that Assistant City Manager Zach Kyle "stripped her of her supervisory authority." (Doc 55 Opening Brief 43-44) Even so, Hairgrove's sworn testimony and her admissions demonstrate that she qualified for the executive exemption.

### 1.    Hairgrove's duties are not in dispute

Hairgrove admitted that her offer letter, resume and discovery responses accurately described the DSI director job duties. (JA0679-709, JA0711-712, JA0721, JA0815, JA0892-895, JA0901-902) *See McVay v.*

*Mayflower Vehicle Sys.*, 2008 U.S. Dist. LEXIS 142432, at *19-20 (S.D. W. Va. July 31, 2008) (finding significant Plaintiff's admission that his job description listing managerial duties was accurate).

The posting for the DSI director describes an executive position: "[develops and oversees downtown development and revitalization activities and projects," "[d]evelops marketing strategies," "[b]uilds cooperative working relationships with boards, property owners, business and community partners," "prepares and submits annual budgets" and "seeks to establish new economic development initiatives." (JA0798-799)

Hairgrove's post-DSI resume describes an executive position: "built new department and merged economic development duties through new quasi-governmental structure," "Managed 2 Full-Time Staff Members . . . plus 21 Member Board," "City Management Team Member," "Department Head/Management Team Member responsible for overseeing planning and development in MSD, staying within budget, cutting for efficiency and conservation of funds," "Led board meetings, multiple committee meetings, oversight of budget," and "updated by-laws/operational documents." (JA0892)

Hairgrove further admitted that her responsibilities, accomplishments, and future goals were memorialized in DSI Board meeting minutes, work plans, and goals/objectives worksheets she prepared. (JA0713-715, JA0821-828, JA1087-1103).

In fact, in DSI's May 2018 response to Salisbury's RFP, Hairgrove identified herself as the executive director responsible for: "[p]rovid[ing] goal planning oversight and implementation planning for Board and Committees," "Oversee[ing] daily duties of the non-profit business office," "Facilitat[ing] meetings between City Departments and developers/property/business owners" and "Supervis[ing] staff." (JA0815) (*See* also JA0717-721) (response to RFP accurately describes her job duties).

Hairgrove's effort to disavow these admissions is ineffective. (*See* Doc 55, Opening Brief 41-42). First, she admits that after October 2018, she had 2 full-time employees. (*Id.* at 42) Second, her supervisor was unable to evaluate her on her supervisory abilities in January 2019 because she had two full-time staff members for only a few months at that juncture; not because she was not a supervisor as she implies. And last, the contention that she was "stripped" of her supervisory authority

28

is untrue, as in one instance Latoya Price was assigned a project that Hairgrove could not handle. (JA1081-1082)

2.  The DSI board minutes show Hairgrove's primary duties were managerial

The DSI board's minutes provide multiple examples of Hairgrove describing managerial duties she was performing on an ongoing basis.

In October 2018, Hairgrove presented her North Carolina Main Street Plan of Work FY 2018-19 to the DSI Board as an accurate depiction of her "duties to achieve economic development objectives within the Municipal Service District." (JA0589-590, JA0821-828) Hairgrove stated that "her main duty is to oversee operations of the nonprofit business office, assist with implementation of the four committees' work, manage the Empire [hotel] redevelopment project, [and] direct the Downtown Development Department by managing staff and projects . . . as a member of the City Management Team." (JA0589-590)

In August 2019, Hairgrove reported that she had prepared and submitted the annual report and was "assembling data for financial review." (JA0595)

Hairgrove reported on her review of the preliminary audit she had been working on with Treasurer Tim Proper, her work with the CPA on DSI finances and her recommendations for changes to the next budget based on their findings. (JA0604, JA0608-609)

In the October 22, 2019 DSI Board meeting, Hairgrove provided a Financial Report to the Board, and reported on the White House staff's visit to the Empire Hotel and the brochure she and her staff created regarding investing in the Empire as an Opportunity Zone. (JA0604-605)

In the May 26, 2020 DSI Board meeting, Hairgrove presented the 2020/2021 proposed budget and reported that she was "working on the organization documents for our main street accreditation." (JA0600-601)

3. <u>Hairgrove's performance evaluations show her primary duties were managerial</u>

Hairgrove's performance evaluations reflect that she was appraised on her execution of managerial duties. (JA1045-1073) For example, Salisbury's evaluation form contains a section devoted to "Managerial and Supervisory Competencies" that included assessments regarding leading by example, servant leadership, providing direction to and supervising staff, and planning and organization. (JA1064) The fact that Hairgrove received poor evaluation scores on these competencies does not

mean that she was not really a manager. There is a substantial difference between an executive being expected to carry out certain enumerated management duties and being criticized for doing a poor job in executing those duties. This was precisely the case with Hairgrove.

### 4. Hairgrove was not a department head in name only, as she claims

A recurring theme in Hairgrove's argument is that she was a department head "in name only." (Doc 55, Opening Brief 3-4, 33, 35) Yet, as the undisputed record shows, Hairgrove did not officially describe her position as a department head "in name only." She was quick to take credit for successes at DSI because she was in charge. It was only when faced with the demise of her disingenuous overtime claim that she claimed she was just an employee.

"Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." 29 C.F.R. § 541.700(a). Hairgrove's primary responsibility was oversight of DSI operations and its daily activities, which she emphasized during DSI board meetings and any other opportunity she had to "educate" the board about her position. (JA0643-647, JA0723) Hairgrove testified that her job as a "full time

31

Executive Director" was "to assist with getting the whole overall [DSI work] plan done and . . . directing the development of the downtown," including building redevelopment and ensuring that her staff was present at DSI events. (JA0642-643, JA0718) Hairgrove perceived these managerial and oversight duties to be the most important and she spent most of her time each day performing these duties. (*Id.*) *See* 29 C.F.R. §§ 541.700(a), (b). Her viewpoint supports the conclusion that her primary duty was management of DSI. *See McVay v. Mayflower Vehicle Sys.*, 2008 U.S. Dist. LEXIS 142432, at *17 (S.D. W. Va. July 31, 2008) (recognizing the importance of Plaintiff's own perception that he was "responsible for the whole [press room] floor" and its "everyday activities").

### 5. Hairgrove's claims of "micromanagement" do not alter her status as an exempt executive

Hairgrove cannot defeat the executive exemption by mischaracterizing normal supervision by the DSI Board and City as "micromanagement." (Doc 55, Opening Brief 10, 61 (referencing monitoring of emails and key scans); JA1801 ¶111, JA1806 ¶120, JA1809 ¶127, JA1818 ¶148, JA1834 ¶189) The executive exemption does not require a complete absence of oversight by supervisors, but only *relative* freedom from supervision. *Aguirre v. Joe Theismann's Rest.*, 2019 U.S.

Dist. LEXIS 238123, *21-23 (E.D. Va. Dec. 3, 2019); *Ward v. Family Dollar Stores, Inc*., 2012 U.S. Dist. LEXIS 126052, at *36-37 (W.D.N.C. Aug. 24, 2012); *Thomas v. Speedway SuperAmerica, LLC*, 506 F.3d 496, 507-508 (6th Cir. 2007) (this factor "does not demand complete freedom from supervision, such that [an employee] is answerable to no one, as this would disqualify all but the chief executive officer from satisfying this factor").

Hairgrove uses purported "micromanagement" – such as the requirement that she respond to emails and phone calls within 24 hours and to maintain certain office hours – as an excuse for her poor job performance. These requirements arose only after complaints that she was not timely responding to calls and emails and was frequently late arriving to work. (JA0433, JA0437-438, JA1911-1920) The reality was that Hairgrove was hopelessly unorganized, as reflected in the DSI Board evaluations, but this does not mean she was improperly classified as an exempt executive employee. (JA1512-1562)

6. <u>Hairgrove supervised, hired, and fired employees</u>

Hairgrove admitted in her deposition that after October 2018 she supervised two full-time employees, and that she was involved in every aspect of the hiring of Latoya Price and Candice Brown, and that she trained and evaluated them. (JA0642-643, JA0646, JA0680-687, JA0690-694, JA0720, JA0825, JA0892-893)

Her claim that she was "stripped of her authority" to supervise Price shamelessly misrepresents what actually happened: Price was placed in charge of the N.C. Main Street Conference in 2019 because Hairgrove was doing a poor job, but this did not, in any respect, change that reporting relationship. (JA0052, JA0653-655, JA1081-1082, JA1823-1824 ¶¶ 163-164)

Against this backdrop, there is no dispute that Hairgrove satisfies the executive exemption.

C. <u>Hairgrove satisfies the administrative exemption</u>

The evidence regarding Hairgrove's job duties demonstrates that she also satisfies the requirements of the administrative exemption. The duties test for an "employee employed in a bona fide administrative capacity" means any employee:

(1)    Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and

(2)    Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

*See* 29 C.F.R. § 541.200(a).

First, Hairgrove's admissions regarding her managerial duties are sufficient to satisfy the first element of the administrative exemption. 29 C.F.R. § 541.200(a)(2). Hairgrove's deposition testimony and presentations to the DSI Board, as reflected in its minutes, show that her primary duty was performing work directly related to management as she was directly involved in overseeing functional areas including finance, accounting, budgeting, auditing, insurance, marketing, hiring and firing employees, training, personnel management and supervision of DSI staff, public relations, and similar activities. *See* 29 C.F.R. § 541.201(b); *See also, Lovo v. Am. Sugar Ref., Inc.*, 2018 U.S. Dist. LEXIS 139543, *37-39 (D. Md. Aug. 17, 2018) (finding supervisory responsibilities satisfied this requirement); *Lane v. Sys. Application & Techs., Inc.*, 2015 U.S. Dist. LEXIS 27422, *9 (D. Md. March 6, 2015) (same).

Second, Hairgrove satisfies the second element because she exercised discretion and independent judgment with respect to matters of significance regarding building a new department under new quasi-governmental structure and using her expertise and knowledge of that structure to execute that mission. 29 C.F.R. § 541.200(a)(3). (*See also* JA0680, JA0892-895) Hairgrove believed she was uniquely qualified to do this and no one else within Salisbury or DSI was sufficiently educated to guide her so she did it on her own. (JA0644, JA0647, JA0723). *See also* WHD Op. Ltr. FLSA 2009-04 (Jan. 14, 2009) (application of exemption to convention and visitors services sales manager due to focus on marketing and promotional work to enhance the city as a destination); WHD Op. Ltr. FLSA 2006-34 (Sept. 21, 2006 (same)).

These factors satisfy the requirement that the employee have authority to implement operating practices, carry out major assignments, and perform work that affects business operations to a substantial degree. *See* 29 C.F.R. § 541.202(b).

For these reasons, Hairgrove also satisfies the administrative exemption.

D.  <u>Hairgrove's evidence on overtime hours worked does not raise a genuine issue of material fact</u>

As a final point, Hairgrove argues that she has presented an accurate calculation of the hours that she worked for DSI by producing a calendar she created from whole cloth months after she resigned from DSI. (Doc 55, Opening Brief 45; JA1564-1574) This estimation of her overtime hours does not support her call for summary judgment to be reversed. The fact is, this calendar, by Hairgrove's own admission, is full of inaccuracies. (JA0281-283, JA1564-1574) The data is incomplete and inherently unreliable as a basis for determining hours worked, especially given that it conflicts with Salisbury's official time records submitted during Hairgrove's employment.

Hairgrove has the burden to show that her employer knew she was working overtime. *Pforr v. Food Lion, Inc.*, 851 F.2d 106, 109-110 (4th Cir. 1988). She has not tendered evidence that Salisbury or DSI had any such knowledge and, indeed, they knew she was a salaried exempt department head who was not entitled to overtime pay.

E.   <u>Hairgrove cannot assert a claim under the NCWHA against Salisbury or Bailey</u>

As a final point, the NCWHA's overtime provision does not apply to "any city, town, county, or municipality, or any State or local agency or instrumentality of government." N.C. Gen. Stat. § 95-25.14(d). Hairgrove's NCWHA claim against Salisbury and Bailey fails for this reason as well.

II.   THIS COURT SHOULD AFFIRM SUMMARY JUDGMENT FOR DEFENDANTS ON HAIRGROVE'S TITLE VII AND § 1983 CLAIMS

Summary judgment is not defeated by unsupported speculation or conclusory allegations. *See e.g. Smith v. Schlage Lock Co., LLC*, 986 F.3d 482, 486 (4th Cir. 2021) (cleaned up) (citations omitted). In cases brought under Title VII and § 1983, a plaintiff cannot forestall summary judgment with bare accusations that a defendant discriminated against them. *See e.g. Autry v. North Carolina Dep't of Human Res.*, 820 F.2d 1384, 1386 (4th Cir. 1987); *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987). Rather, the evidence must allow a jury to reach that conclusion. *See generally id.*

***

Hairgrove argues that a jury should decide her claims for sex-based disparate treatment, sex-based hostile work environment, and retaliation. The legal framework for these claims is the same under both Title VII and § 1983. *See e.g. Gairola v. Virginia Dep't of General Services*, 753 F.2d 1281, 1288, n. 4 (4th Cir. 1985). Hairgrove's claims, nonetheless, are based on speculation rather than evidence. Juries do not decide discrimination claims on speculation and conjecture. *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir. 1995). In turn, this Court should affirm summary judgment.

A.  <u>Hairgrove did not present a triable claim for sex-based disparate treatment</u>

To sustain a sex-based disparate treatment claim under the *McDonnell Douglas* framework, a plaintiff must show:

(1)   she is a member of a protected class;

(2)   her employer took an adverse action against her;

(3)   she had been fulfilling her employer's legitimate expectations at the time of the adverse action; and

(4)   the adverse action occurred under circumstances that raise a reasonable inference of unlawful discrimination, including because the employer left open the position or replaced the plaintiff with someone outside the protected class.

*Sempowich v. Tactile Sys. Tech., Inc.*, 19 F.4th 643, 649-50 (4th Cir. 2021).

This Court should affirm summary judgment on this claim for two reasons. First, Hairgrove abandoned this claim at the district court level because she failed to argue that her evidence satisfied each element. Second, even if the claim was not abandoned, Hairgrove has not made a prima facie case.

1.    <u>Hairgrove abandoned her claim for sex-based disparate treatment at the district court</u>

The district court found that Hairgrove abandoned her sex-based disparate treatment claim in her opposition to summary judgment. "Nowhere in her brief," the court wrote, "does [Hairgrove] discuss whether she suffered an adverse action when she resigned, for example, or whether she was fulfilling her employer's legitimate expectations at the time." (JA1941)

Hairgrove concedes this point on appeal. (Doc 55, Opening Brief 47-49) Yet Hairgrove claims that her oversight was justified because she "did not brief issues which [she] considered obvious from the facts in the record …." (*Id.* at 49) An argument is not preserved for appeal just because a party thinks the issue is obvious. Rather, to preserve an issue,

the appellant "must object on the same basis below as he contends is error on appeal." *United States v. Zayyad*, 741 F.3d 452, 459 (4th Cir. 2014). Consistent with this rule, "[a]rguments raised in a trial court must be specific and in line with those raised on appeal," otherwise they are waived. *In re Under Seal*, 749 F.3d 276, 287 (4th Cir. 2014).

In "exceptional circumstances," an issue may be raised for the first time on appeal. *See e.g. Sony Music Ent. v. Cox Commc'ns, Inc.*, 93 F.4th 222, 235 (4th Cir. 2024). A party's objective belief that an issue is obvious is not an exceptional circumstance, though. And more to the point, Hairgrove makes no argument that exceptional circumstances allow her to make new arguments now.

The fact is, Hairgrove did not preserve any argument that she made a prima facie case for sex-based disparate treatment. This Court should affirm summary judgment on this claim for this reason alone.

More than that, Hairgrove's evidence does not meet the second, third, and fourth *McDonnell Douglas* factors. As such, she cannot sustain her sex-based disparate treatment claim on the merits.

2. <u>Hairgrove did not forecast evidence of an adverse action</u>

An adverse action refers to one that "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 337 (4th Cir. 2011) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998) (internal quotations omitted)).

Hairgrove cannot show an adverse action here because she was not terminated, she quit. To overcome this reality, Hairgrove argues that she was subject to a constructive discharge. To prove this, Hairgrove must show that Salisbury "deliberately made [her] working conditions intolerable, and thereby forced her to quit." *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 378 (4th Cir. 2004) (cleaned up, internal citations omitted).

Constructive discharge is a high bar. "Dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign." *Booz-Allen & Hamilton*, 368 F.3d at 378 (cleaned up, internal citations omitted).

42

On this point, Hairgrove contends that her working conditions became intolerable after March 17, 2020, when the DSI board questioned why she recorded a closed session meeting without permission. (Doc 55, Opening Brief 49-51) The evidence, however, does not show that anyone made her working conditions "intolerable" such that she had to quit. Instead, the evidence is that Hairgrove did not see eye-to-eye with DSI board members and that she had performance issues. (JA1045-1073) Criticisms and demanding work conditions do not amount to constructive discharge. *See e.g. Booz-Allen & Hamilton, Inc.*, 368 F.3d at 378. *See also Carter v. Ball*, 33 F.3d 450, 459 (4th Cir. 1994).

For her part, Hairgrove cannot refute this principle with any precise evidence. In generic fashion, she claims "there is sufficient evidence to show that [Hairgrove] felt her working conditions were 'so intolerable that a reasonable person' in her position 'would have felt compelled to resign,'" without any description of what that evidence is. (Doc 55, Opening Brief 50-51) It is Hairgrove's burden to identify this evidence and explain why it shows a constructive discharge. *See* Fed. R. App. P. 28(a)(8)(A) (requiring argument section of an appellant's opening brief to contain "appellant's contentions and the reasons for them, with

43

citations to the authorities and parts of the record on which the appellant relies"). She has not done so.

Hairgrove's evidence does not meet the second *McDonnell Douglas* element.

### 3. Hairgrove did not forecast evidence that she met her employers' legitimate expectations

To meet the third element of the *McDonnell Douglas* test, Hairgrove must present "probative evidence that [s]he was, in fact, performing at a level that met [her] employer's legitimate expectations." *Hill v. Se. Freight Lines, Inc.*, 877 F. Supp. 2d 375, 391 (M.D.N.C. 2012), *affirmed*, 523 Fed. Appx. 213 (4th Cir. 2013). This decision is judged from the employer's perspective, not the employee's viewpoint. *Id. See also Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 272 (4th Cir. 2005). Courts do not review employment performance. *Id.*

Hairgrove tries to argue that she met employment expectations a few different ways. At first, Hairgrove argues that her performance fulfilled expectations because the Main Street Program itself met the minimum standards for accreditation. (Doc 55, Opening Brief 51). This argument is misleading. Program performance does not dictate whether an individual employee fulfilled expectations. If it could, then any sub-

par employee could satisfy this element by pointing to company-wide metrics. There is no legal support for this idea, creative as it may be.

From there, Hairgrove pulls a few positive comments from her performance review in November 2019 to argue she was meeting expectations. (Doc 55, Opening Brief 51-52) That argument paints an incomplete picture of Hairgrove's performance at that time. Even if Hairgrove received some good feedback in this review, she still received four "unsatisfactory" ratings overall. (JA0496-509) A few hand-picked comments do not override the larger conclusion that Hairgrove's work was unsatisfactory in multiple areas. (JA0481-511, JA0513-526)

Either way, Hairgrove's arguments miss the larger picture. Hairgrove claims the adverse action (constructive discharge) occurred *after* March 2020. There is no dispute that Hairgrove was not fulfilling her employer's expectations at that point, as the pre-dismissal letter lays out. (JA0778-780) Hairgrove makes no argument that she was fulfilling expectations when she alleges the constructive discharge occurred. *Cf. Sempowich*, 19 F.4th at 650 (evidence that an employee had high performance ratings and received awards, a raise, and an equity grant

raised a reasonable inference that the employee performed at a satisfactory level).

Hairgrove's evidence does not meet the third *McDonnell Douglas* element. Summary judgment should be affirmed on this independent ground too.

> 4. <u>Hairgrove did not forecast evidence that the alleged adverse action occurred under circumstances that raise a reasonable inference of unlawful discrimination</u>

The last element requires Hairgrove to show that the circumstances surrounding the alleged adverse action raise a reasonable inference of unlawful discrimination. *Sempowich*, 19 F.4th at 649-50. The classic example is when a male is hired to replace a female. *Id*. That did not occur here. Hairgrove was replaced by a female, Latoya Price, who was then replaced by another female, Sada Troutman. (JA0156)

Because Hairgrove cannot argue that her position was filled by a male, she offers a non-specific argument that two male department heads were treated better than she because they were not subject to feedback from DSI board members, and these heads were not subject to the same email audits as she was. (Doc 55, Opening Brief 52-57)

Hairgrove's argument is anecdotal. She presented no evidence that these male department heads had similar performance issues. *Compare Luciano v. Olsten Corporation*, 110 F.3d 210, 216 (2d Cir. 1997) (discrimination inference shown by evidence that male employees with poor performance reviews received promotions and raises over women with better performance reviews) *with Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 281 (4th Cir. 2000) (plaintiff with poor performance reviews, who did not get along with her supervisor, did not raise discrimination inference with evidence that supervisor treated white employees better than her). For this reason alone, Hairgrove has not shown a discriminatory intent.

In addition, a plaintiff must demonstrate that a performance review was dishonest before they can argue that a review shows a discriminatory inference. *Hawkins*, 203 F.3d at 280. It is not enough to dispute a review on the merits. *Id.* Hairgrove makes no argument that Salisbury and Bailey gave her dishonest evaluations. She just believes the reviews should have been better. Hairgrove has not shown a discriminatory intent for this reason as well.

Last, Hairgrove's position overlooks the bigger point. She argues that male department heads were held to different standards, reviewed

by different people, and not subject to the same working conditions as her. (Doc 55, Opening Brief 55-57). But standards, reviews, and working conditions are not adverse actions to begin with. *See e.g. Booz-Allen & Hamilton, Inc.*, 368 F.3d at 378; *Carter*, 33 F.3d at 459. Hairgrove needs to present evidence that she sustained a sex-based adverse action. Her personal belief that male department heads had it easier than she does not meet this standard.

Hairgrove's evidence does not meet the final *McDonnell Douglas* element. As a result, summary judgment should be affirmed.

B. <u>Hairgrove did not present a triable claim for sex-based hostile work environment</u>

Title VII and § 1983 prohibit employers from "subjecting an employee to a hostile work environment." *See Robinson v. Priority Auto. Huntersville, Inc.*, 70 F.4th 776, 781 (4th Cir. 2023). A "hostile work environment" means a workplace that is "so permeated with discriminatory intimidation, ridicule, and insult, that it would reasonably be perceived, and is perceived, as hostile or abusive." *Id.*

To prove a "hostile work environment," Hairgrove must prove: (1) unwelcome harassment; (2) based on her sex; (3) that was so "severe or pervasive" that it altered her employment conditions and created an

abusive work environment; and (4) that the harassment was imputable to her employer. *Robinson*, 70 F.4th at 781.

To decide whether an environment was hostile, "the Court must look at all the circumstances, which may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 118 (4th Cir. 2021) (cleaned up). This is an objective standard. *Robinson*, 70 F.4th at 781.

*** 

Hairgrove's arguments on this claim are lacking in substance. She references incidents of a hostile workplace, but does not describe these incidents with specificity. (Doc 55, Opening Brief 58) Hairgrove maintains her affidavit "gave examples of the hostile work environment," but she does not describe these examples. (*Id.*) Again, it is Hairgrove's obligation to cite and specify the evidence that supports her call for reversal. Fed. R. App. P. 28(a)(8)(A).

The record evidence, nonetheless, reflects that Hairgrove did not meet job expectations, which led to disagreements and confrontations

with colleagues and supervisors. (JA0127-135, JA0420-421, JA0481-0511) Hairgrove never complained about a sex-based hostile work environment in her April 12, 2020 letter response to the DSI board. (JA1441-1450)

Hairgrove then argues that the district court weighed her complaints about bullying, rude remarks, and the like. (Doc 55, Opening Brief 60) The district court did not weigh anything. It identified this evidence to analyze Hairgrove's argument, but it pointed out that these events were not based on sex or "so severe and pervasive" that they created an abusive work environment. (JA1942-1945)

***

Hairgrove cites to *Boyer-Liberto v. Fontainebleau Corp.*, for the idea that a single discriminatory remark can create a hostile work environment. 786 F.3d 264, 285 (4th Cir. 2015). She then claims that one instance where a DSI board member allegedly said that Hairgrove "'needed to be more like' a certain man who worked for the City and who wore 'nice suits'" gives rise to a hostile work environment under *Boyer-Liberto*. That stretch does not fit.

In *Boyer-Liberto*, a supervisor directed an unspeakable racial slur at the plaintiff and as the plaintiff worked her job. 786 F.3d at 269-71. This Court recognized that racial epithets by a supervisor are "extremely serious" and can alter employment conditions on the spot. *Id*. at 277-78.

At best, the comment cited by Hairgrove may be unprofessional. But Title VII does not operate as a "general civility code" in the workplace. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998). And "incidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe or pervasive standard." *Evans v. Int'l Paper Co.*, 936 F.3d 183, 192 (4th Cir. 2019) (quoting *E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008)). An offensive utterance, alone, does not alter employment conditions. *Id*. (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).

To sum it up, an off-hand comment that Hairgrove "needed to be like a certain man" who worked for Salisbury does not show a hostile work environment, on its own, under *Boyer-Liberto* and its predecessors.

***

As a final point, Hairgrove has not overcome Salisbury's *Ellerth/Faragher* affirmative defense. *Faragher v. City of Boca Raton*,

51

524 U.S. 775, 778 (1998). The record shows that Salisbury (1) exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (2). Hairgrove failed to take advantage of any preventive or corrective opportunities. *Id*. Salisbury trained Hairgrove on its workplace anti-harassment policy and reporting procedures for harassment, and Hairgrove acknowledged this training on October 11, 2017 and May 7, 2018. (JA0578-582) Despite this training, Hairgrove never reported a sex-based hostile work environment. This Court should affirm summary judgment for this reason as well.

C.    <u>Hairgrove did not present a triable claim for retaliation</u>

Hairgrove argues a triable retaliation claim under the *McDonnell Douglas* framework. To prove this claim, she must show:

(1)    she engaged in a protected activity;

(2)    the employer took an adverse action against her; and

(3)    a causal connection between the protected activity and the asserted adverse action.

*Walton v. Harker*, 33 F.4th 165, 177 (4th Cir. 2022).

Employees engage in protected conduct when they "complain to their superiors about suspected violations of Title VII." *Bryant v. Aiken Reg'l Med. Ctrs. Inc.*, 333 F.3d 536, 543–44 (4th Cir. 2003). The employee

must oppose an unlawful practice, or a practice they reasonably believe is unlawful, to engage in protected conduct. *DeMasters v. Carilion Clinic*, 796 F.3d 409, 417 (4th Cir. 2015).

Hairgrove argues that she complained about a hostile work environment in June 2019 and March 2020. The evidence from June 2019 shows that Hairgrove was issued a disciplinary action report, but there is no evidence that she claimed the report was issued in retaliation for a discrimination complaint. (JA0510-511). And, as pointed out above, Hairgrove never complained about a sex-based hostile work environment in her April 12, 2020 letter response to the DSI board's March 2020 letter. (JA1441-1450) The fact that Hairgrove never complained about alleged discriminatory conduct defeats her retaliation claim. *See e.g. McIver v. Bridgestone Ams., Inc.*, 42 F.4th 398, 411 (4th Cir. 2022).

In a last-ditch effort to save her claim, Hairgrove pivots from her sex-based claim altogether and claims she was retaliated against for reporting an alleged open meetings violation. Hairgrove made no such allegation in her complaint. And, as the district court noted, "parties cannot amend their complaints through briefing." *S. Walk at Broadlands Homeowners Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013).

***

Hairgrove has not satisfied the second two elements of her retaliation claim either. She has not shown an adverse action, as briefed *supra* II.B.2., and she has not shown that her protected activity was the but-for, direct cause of her alleged constructive discharge. *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 339, 362 (2013).

D.    <u>Hairgrove has abandoned any claim that defendants retaliated against her and sabotaged future employment.</u>

Hairgrove alleged in her amended complaint that Salisbury and Bailey retaliated against her and sabotaged her employment with the Lexington Tourism Authority (LTA) after she filed an EEOC charge. (JA0061-62) Hairgrove did not brief this claim on appeal. The claim is now waived. *See* Fed. R. App. P. 28(a)(8)(A); *United States v. Holness*, 706 F.3d 579, 592 (4th Cir. 2013) ("contentions not raised in the argument section of the opening brief are abandoned") *Williams v. Giant Food Inc.*, 370 F.3d 423, 430 n.4 (4th Cir. 2004) (same).

E.    <u>Hairgrove has abandoned her individual capacity claims against Bailey</u>

Hairgrove makes no argument in her brief that summary judgment should be reversed and remanded as to her individual capacity claims

54

against Bailey. Those claims have been waived now too. *Holness*, 706 F.3d at 592; *Giant Food Inc.*, 370 F.3d at 430 n.4.

And those claims are subject to two additional defenses raised before the district court. First, to sustain a § 1983 claim against person, the plaintiff must plead that the individual acted under the color of state law. *Davis v. Durham Mental Health Developmental Disabilities Substance Abuse Area Auth.*, 320 F. Supp. 2d 378, 403 (M.D.N.C. 2004). In addition, when proceeding under § 1983, a plaintiff must allege that the government official acted "personally in the deprivation of the plaintiff's rights." *Bostic v. Rodriguez*, 667 F. Supp. 2d 591, 612 (E.D.N.C. 2009) (citing *Wright v. Collins*, 766 F.2d 841, 850 (4th Cir. 1985)). Hairgrove made no argument on this point.

Second, Bailey is protected from those claims by qualified immunity, unless the evidence shows that he violated a "clearly established" constitutional right. *Doe ex rel. Johnson v. S.C. Dep't of Soc. Servs.*, 597 F.3d 163, 169 (4th Cir. 2010). Bailey made this argument at the district court as well, and Hairgrove made no argument on this point either.

## CONCLUSION

Hairgrove has not shown a genuine issue of material fact sufficient to reinstate her wage and hour claims or her discrimination claims. Summary judgment should be affirmed.

This the 3rd day of May 2024.

CRANFILL SUMNER LLP

BY:    */s/ Steven A. Bader*
       STEVEN A. BADER
       N.C. State Bar #55931
       P.O. Box 27808
       Raleigh, North Carolina 27611
       Telephone: 919-828-5100
       E-mail:  sbader@cshlaw.com

       PATRICK H. FLANAGAN
       N.C. State Bar #17407
       E-mail:  phf@cshlaw.com
       STEPHANIE H. WEBSTER
       N.C. State Bar #12164
       Post Office Box 30787
       Charlotte, North Carolina 28230
       Telephone: (704) 332-8300

       *Counsel for Defendants-Appellees*
         *City of Salisbury and Lane Bailey*

       VAN HOY, REUTLINGER, ADAMS &
       PIERCE, PLLC

       G. BRYAN ADAMS, III
       N.C. State Bar # 17307
       737 East Boulevard
       Charlotte, North Carolina 28203
       Telephone:  704-375-6022
       Email:  bryan.adams@vraplaw.com

       *Counsel for Defendant-Appellee*
         *Downtown Salisbury, Inc.*

# CERTIFICATE OF COMPLIANCE

1.    This document complies with type-volume limits because excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

    this document contains <u>9,844</u> words.

2.    This document complies with the typeface requirements because: this document has been prepared in a proportional spaced typeface using <u>Microsoft Word</u> in <u>14-point Century Schoolbook.</u>

Dated:  May 3, 2024

BY:  <u>/s/ Steven A. Bader</u>
STEVEN A. BADER

*Counsel for Defendants-Appellees*
*City of Salisbury and Lane Bailey*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on May 3, 2024, I electronically filed the foregoing *Brief of Appellees* with the Clerk of Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system, which will send automatic notice to counsel of record as set out below:

> Valerie Bateman
> New South Law Firm
> 209 Lloyd Street, Ste, 350
> Carrboro, NC  27510
> Email:  valerie@newsouthlawfirm.com

This the 3rd day of May 2024.

BY:  */s/ Steven A. Bader*
Steven A. Bader
N.C. State Bar #55931
Cranfill Sumner LLP
P.O. Box 27808
Raleigh, North Carolina 27611
Telephone: 919-828-5100
E-mail:  sbader@cshlaw.com

*Counsel for Defendants-Appellees*
*City of Salisbury and Lane Bailey*